Wilton E. **HALL** and Greenville Television Company, Appellants,

v.

**FEDERAL COMMUNICATIONS COMMISSION**, Appellee,

Spartan Radiocasting Company, Intervenor.

No. 13231.

United States Court of Appeals District of Columbia Circuit.

Argued June 13, 1956.

Decided Sept. 6, 1956.

Petition for Rehearing Denied Oct. 22, 1956.

**570**

Mr. Benedict P. Cottone, Washington, D. C., with whom Messrs. Arthur Scheiner and Ben C. Fisher, Washington, D. C., were on the brief, for appellants.

Mr. J. Smith Henley, Associate Gen. Counsel, Federal Communications Commission, with whom Messrs. Warren E. Baker, Gen. Counsel, Richard A. Solomon, Asst. Gen. Counsel, Daniel R. Ohlbaum and John J. O'Malley, Jr., Counsel, Federal Communications Commission, were on the brief, for appellee.

Mr. William J. Dempsey, Washington, D. C., with whom Messrs. William C. Koplovitz and Harry J. Ockershausen, Washington, D. C., were on the brief, for intervenor.

Before EDGERTON, Chief Judge, and BAZELON and FAHY, Circuit Judges.

BAZELON, Circuit Judge.

Appellants protested a Federal Communications Commission order of April 30, 1954, granting intervenor a modification of its permit to construct and operate a television station on Channel 7, assigned to Spartanburg, South Carolina.[1] Those protests were denied by the Commission without a hearing, upon the ground that appellants did not appear to be "parties in interest," but we reversed that action and remanded the cause to the Commission for hearing under § 309 (c) of the Communications Act.[2] Greenville Television Co. v. Federal Communi-

---

1. Sixth Report and Order, 1 Pike & Fischer Radio Reg. Part 3, 91:599, 91:918 (1952).

2. 66 Stat. 715, 47 U.S.C.A. § 309(c).

cations Comm., 1955, 95 U.S.App.D.C. 314, 221 F.2d 870. On March 9, 1956, after hearing, the Commission affirmed its grant of the modification permit. This appeal followed.

For introductory purposes the facts are sufficiently stated in our earlier opinion. Such additional facts as may be relevant will be detailed at appropriate parts of this opinion.

## I. The Propagation Curves

 We first consider the last of the issues stipulated by the parties: "Whether the Commission made proper findings, based upon evidence of record, to support a determination that public interest, convenience and necessity would be served by a modification of the original construction permit granted to Intervenor."

The Commission and intervenor, in stipulating this issue, reserved the right to "raise jurisdictional questions" with respect to it. The Commission does not appear to have exercised its reserved right. But the intervenor has, by contending that the issue was not asserted as a ground of protest and that, moreover, there was no need for the Commission to make a public interest determination in this proceeding. We dispose of this jurisdictional matter before discussing the merits of the issue.

The modification permit was granted without a hearing under § 309(a) of the Communications Act, which provides: "If upon examination of [an] application * * * the Commission shall find that public interest, convenience, and necessity would be served by the granting thereof, it shall grant such application." Absent protest under § 309(c), the *ex parte* determination of public interest thus made by the Commission would support the grant. Nor does it follow that, by entertaining a protest and holding a hearing under § 309(c), the Commission necessarily vitiates its earlier *ex parte* determination that the grant of an application would serve the public interest. An application is not subjected to all the tests of a comparative proceeding merely because its grant has been protested. But, neither is the earlier public interest determination conclusive. If it appears, upon the hearing held under § 309(c), that the earlier *ex parte* grant was improvident, because it would not serve the public interest, the permit should be cancelled. That the particular respect in which the grant offends may not have been alleged as one of the specific grounds of the protest does not preclude this result. The purpose of the statute is to search out the public interest. We said in Clarksburg Publishing Co. v. Federal Communications Comm., 1955, 96 U.S.App.D.C. 211, 215, 225 F.2d 511, 515:

> "The statute contemplates that, in appropriate cases, the Commission's inquiry will extend beyond matters alleged in the protest in order to reach any issue which may be relevant in determining the legality of the challenged grant. Clearly, then, the inquiry cannot be limited to the facts alleged in the protest where the Commission has reason to believe, either from the protest or its own files, that a full evidentiary hearing may develop other relevant information not in the possession of the protestant."

*A fortiori*, where the information relevant to the public interest has already been disclosed by the evidentiary hearing, the Commission's "inquiry cannot be limited to the facts alleged in the protest." So, if it appears upon the record of the § 309(c) proceeding that *the public loses rather than gains from the modification of intervenor's construction permit*, the Commission must reckon with that circumstance even if it was not alleged in the protests.

 We are thus brought to the merits of the issue and a consideration of the engineering evidence which looms so large in this case. Appellants sought to prove to the Commission that the modification violated § 307(b) of the Act providing for "fair, efficient and equitable" distribution of service among communi-

ties and § 3.607[3] of the Commission's Rules governing availability of channels from the Table of Assignments promulgated in the Commission's Sixth Report and Order.[4] In short they sought to establish that the modification made intervenor's station a Greenville station rather than a Spartanburg station. In this they failed,[5] but they did prove, if their evidence is acceptable, that the modification would result in a diminution of the signal to the Spartanburg area, thus eliminating service to some areas and some people and down-grading service to those who will continue to receive the signal. That such a curtailment of service is not in the public interest is axiomatic. Whether or not it may be off-set by concomitant factors is something the Commission should consider.[6] For example, the Commission concluded that intervenor's move to Paris Mountain was made in order to obtain a network affiliation with the Columbia Broadcasting System. Had the Commission concluded from the engineering evidence that the move would down-grade service to the Spartanburg community, it could then have considered whether the value to the community of a network affiliation outweighed the cur-

tailment of coverage, whether a network other than CBS might be available without a change, and whether a CBS affiliation necessitated lowering both power and antenna height, as well as relocating the transmitter. Since, however, the Commission repudiated the conclusion of service curtailment which would follow from an acceptance of the engineering evidence and, therefore, gave no consideration to possible compensating factors, we confine ourselves to the engineering evidence and what follows therefrom.

The modification permit authorized intervenor to construct its transmitter slightly farther from Spartanburg and much closer to Greenville and Anderson than originally authorized by the construction permit. It also provided for a considerably lower tower and considerably less power.[7]

■ The Commission found "the pertinent effects of the change" were (1) to reduce the station's minimum signal over Spartanburg from 95 dbu to 85 dbu; (2) to reduce the percentage of the population of the Spartanburg trading area which would receive Grade A [8] service from 99.96% to 87%; (3) to reduce

3. 1 Pike & Fischer Radio Reg. 53:625.

4. Supra note 1.

5. Section 3.685(b) of the Commission's Rules, 1 Pike & Fischer Radio Reg. 53:-680, requires that "In general, the transmitting antenna of a station should be located at the most central point at the highest elevation available." Because of the interplay of the various factors which determine the quality of a transmitter site, the Commission has read a high degree of flexibility into this rule and does not require a transmitter to be located in or near the principal city to be served. Because of this and because communities may be close to each other, it may happen that the signal to the community to be served, though adequate, may be weaker than to the adjacent community. We agree with the Commission that such a circumstance is not a violation of the Rule. As a matter of fact, in this case intervenor's station would send a slightly better signal to Greenville than to Spartanburg even under the original construction permit.

6. Beaumont Broadcasting Corp. v. Federal Communications Commission, 1952, 91 U.S.App.D.C. 111, 117, 202 F.2d 306, 312.

7. The transmitter on Hogback Mountain, as originally authorized, would have been 26 miles northwest of Spartanburg, 23 miles northeast of Greenville and 50.2 miles northeast of Anderson. The antenna height would have been 2000 feet above average terrain and the effective radiated power 316 kw. The Paris Mountain transmitter, authorized by the modification permit, would be 27 miles west of Spartanburg, 5.6 miles north of Greenville and 32.2 miles northeast of Anderson. The antenna would be 1182 feet above average terrain and the effective radiated power 200 kw.

8. For a definition of "Grade A" and "Grade B," see Clarksburg Publishing Co. v. Federal Communications Comm., 96 U.S. App.D.C. at pages 215–216, 225 F.2d at pages 515–516.

service from Grade A to Grade B for about 250,000 persons; and (4) to deprive of any service whatever some [9] persons who would have been within the Grade A contour of the Hogback operation.

The foregoing "pertinent effects" are detailed in the Commission's decision not as contentions of the appellants, but as formal findings of the Commission. But the Commission adds in a footnote that those findings were based on the official propagation curves which are incorporated in its rules [10] and that it does not really believe that those curves can support such findings. We are thus presented with an anomalous record. If the Commission has found the facts as stated, appellants are entitled to a reversal. If the Commission has not found the facts, it would appear that it expects us to exercise that function in its stead. That we may not do. To resolve the anomaly, we read the Commission's decision as a refusal to make findings from the propagation curves. Thus read, the issue before us is whether that refusal was arbitrary and unreasonable.

The degree of reception of television service is measured in terms of statistical probabilities—*e. g.*, whether a signal of a given intensity will be received 90% of the time by at least 70% [11] of the locations at the outer limits of the service area in question. The mathematical curves and equations by which these determinations are made were originally promulgated in Appendix B of the Third Notice of Proposed Rule Making [12] for use in drawing up the table of assignments contained in the Sixth Report and Order. They are "based on an extensive number of measurements made at various locations over a long period of time." [13] The field intensity contours are a function of a great number of variables in addition to the obvious factors of transmitter power and distance and height of the radiating antenna [14]—such factors as temperature,

9. The engineering exhibits, prepared and testified to by a recognized and qualified radio and television engineer, disclose that the number of persons thus deprived of service would be about 228,000, according to "an analysis" that had been made. The Commission, by a "transposition" from one map to another, concluded that the Grade B contour of the Paris Mountain operation would include "a very substantial portion" of the Hogback Grade A service area, and it said, "In view of this, and without further evidence, it would appear that this figure is in error." The figure purported to be based not upon the maps, but upon "an analysis." The basis of the analysis was open to cross-examination and challenge when the exhibit was offered in evidence. Counsel for the Commission's Broadcast Bureau stated at that time that he had no objection to the exhibit except upon grounds not now material. Intervenor, similarly, objected only upon grounds now immaterial. The Examiner admitted the exhibit in evidence subject to a motion to strike after cross-examination. The witness was cross-examined, but was asked no questions about the "analysis" upon which he based his population figures. No motion to strike was made and the Examiner received the exhibit without reservation. The Examiner eventually made a finding that "some 228,178 persons" who would have received Grade A service under the original proposal would receive no service under the modification. In the face of this record, we think the Commission's insistence upon "further evidence" to support the figure of 228,178 persons was unreasonable. Further, we find nothing in the record from which the figure can be argued to be in error. The two maps cannot be transposed upon one another, for they are on different scales and the Grade A contours appearing on one of them are only partially drawn. Moreover, even if the figure were in error, the Commission seems to admit that *some* people would lose service, for it does not claim that all of the Hogback Grade A area is included within the Paris Grade B, but only "a very substantial portion" thereof.

10. 1 Pike & Fischer Radio Reg. 53:675, 53:705–21.

11. That would be Grade A service. For Grade B service the number of locations need be only 50%.

12. 16 Fed.Reg. 3072, 3080 et seq. (filed April 6, 1951).

13. Id. at 3076.

14. See Rule 3.685(a) and (b), 1 Pike & Fischer Radio Reg. 53:679–80.

humidity, terrain, foliage, type of receiver and height of receiving antenna.[15] The Commission recognized that, because of these multiple variables, revisions of the propagation charts would need to be made "from time to time as more measurements are made," but was "satisfied that on the basis of the data presently available to it the data underlying the propagation charts are sufficient to afford an adequate statistical basis for describing field intensities under average conditions." [16] On the other hand, the Commission also recognized "that there may be substantial variations in individual areas." [17] Upon this last proposition the Commission founds its present contention.

The Commission argues that *possible* variation of the numerous unknowns in the equation *may* make Spartanburg an abnormal area for which an application of the propagation curves cannot produce true contours.

Though compelled to admit that the contours relied on by appellants are accurate *as a matter of high statistical probability*, the Commission asserts that they have not been demonstrated to be *actually* accurate and, therefore, should be rejected as a basis for findings. The Commission's view is erroneous. The law does not always insist upon proof that a thing is *necessarily* so. It is accustomed to rely upon probabilities. No better analogy is required than the acceptance of mortality tables to prove life expectancy.[18] The virtue of such evidence is that, instead of being confronted with a vacuum of knowledge, the tribunal is "left with less to guess about, learning with relative accuracy what average experience is." Watkins v. Holmes, 1943, 93 N.H. 53, 35 A.2d 395, 398. Just as average life expectancy as shown by tables is admissible even where the individual is not average, United Verde Extension Mining Co. v. Koso,[19] the propagation curves are admissible to prove contours even where the area may be abnormal. Evidence of such abnormality would, of course, also be admissible and might outweigh the probative force of the propagation curves.[20] But appellants, who rely upon the propagation curves, are not required to prove the area normal. As we said in W. S. Butterfield Theatres, Inc., v. Federal Communications Comm., 99 U.S.App.D.C. ——, 237 F. 2d 552, 557: "The Commission's view that ad hoc exceptions to the rules are to be accepted on faith, while he who relies on the rule has the burden in each case of re-establishing it by independent proof, is error." Certainly, if Spartanburg were asserted to be an abnormal area, it would be altogether fair to require that proof of the abnormality be adduced by the parties relying thereon. Absent such proof, the propagation curves are applicable.

The inconsistency of the Commission's position is exemplified by the fact that it used the propagation curves to calculate the coverage of every single station it allocated in the Sixth Report and Order.[21] In making these allocations, the Commission "sought to distribute the available

15. Appellee's brief, pp. 14, 16; J.A. 231–32.

16. Supra note 13. As a matter of fact, on June 26, 1956, the Commission published additional propagation data which "improve somewhat the predictions which can now be made in the average case." See Report and Order in Docket No. 11532, pars. 39–40 and Appendix A, referred to in dissenting opinion in Van Curler Broadcasting Corp. v. United States, 98 U.S.App.D.C. 432, 236 F.2d 727.

17. Supra note 13; see also supra note 1, par. 88.

18. United Verde Extension Mining Co. v. Koso, 9 Cir., 1921, 273 F. 369; Giles v. Chicago Great Western Ry. Co., D.C.D. Minn.1947, 72 F.Supp. 493, 496.

19. Supra note 18.

20. Similarly mortality tables are not necessarily controlling where there is other evidence of life expectancy, but are simply to be weighed with all other proof. Glover v. Berger, 1953, 72 Wyo. 221, 263 P. 2d 498; Starnes v. Tyson, 1946, 226 N.C. 395, 38 S.E.2d 211, 213; Hemsell v. Summers, Tex.Civ.App.1940, 138 S.W. 2d 865, 868.

21. Supra note 1, pars. 85 et seq.

channels so as to achieve maximum television coverage with a minimum of interference between stations * * *." Logansport Broadcasting Corp. v. United States, 1954, 93 U.S.App.D.C. 342, 344, 210 F.2d 24, 25–26. And when a particular assignment was attacked as not providing a fair and equitable distribution of service, we held that the Commission had founded it upon "substantial evidence." Id., 93 U.S.App.D.C. at page 346, 210 F.2d at page 28.

But the Commission argues that it is not "inherently inconsistent" to reject the propagation curves as an index of coverage of a specific station while using it as the basis for a nation-wide Table of Assignments. A fallacy of this argument, as has already been shown, is that a general rule is not rendered inapplicable merely by a *possibility* that the specific situation varies from the norm.[22] The Commission itself, moreover, customarily uses the propagation curves to measure the service areas of specific stations. Thus it uses them to measure overlap in connection with its multiple ownership rule, see Clarksburg Publish-

ing Co. v. Federal Communications Comm'n, 96 U.S.App.D.C. at pages 215–216, 225 F.2d at pages 515–516, and to justify ad hoc "drop-ins" of unassigned channels. See Van Curler Broadcasting Corp. v. United States, 98 U.S.App.D.C. 432, 236 F.2d 727. The Commission even used the curves, at earlier stages of this proceeding, to measure the coverage of the very station here in question, in order to justify its conclusion that the coverage change was not enough to constitute an economic peril to the appellants.[23]

For the Commission to deprive appellants of the propagation curves as a tool to measure coverage, while approving its own use of the curves as "an attempt to make a rough judgment as to future economic loss," is arbitrary and capricious.

## II. The Misrepresentation Issue

One of the major points of contest in this proceeding is whether intervenor is guilty of lack of candor for failing to disclose its true intentions to the Commission,[24] when it applied for special temporary authorization to operate from Paris

---

22. There is nothing in the record to show that the Spartanburg area has any feature rendering the propagation curves inapplicable.

23. Thus it granted intervenor's application for a special temporary authorization over appellants' objections, because of an "engineering study" showing that the interim service contours were contained within those of the authorized station. Appellant Hall's protest against the special temporary authorization was denied on a finding that "the Grade A and Grade B contours of Spartanburg's interim operation from Paris Mountain do not extend beyond the contours authorized in the construction permit and, in fact, the strength of Spartanburg's signal in Anderson will actually be slightly weaker than the Hogback Mountain site." Appellant Greenville's protest was denied on a finding that "the signal * * * to Greenville from the Hogback Mountain site * * * is 93 dbu, or 16 dbu greater than the minimum signal of 77 dbu which is required for urban service for Channel 7 under the Commission's Rules. Thus, the Greenville field intensity from the Hogback Mountain site

is about 6.7 times the field intensity which would be required if the appellant's station were, in fact, a Greenville station." The protests against the grant of the modification permit were denied on similar findings.

In denying Greenville's protest the Commission said: "It must be recognized that the tools available for predicting service do not permit accurate evaluation. In predicting service, certain assumptions as to receiver design, type of antenna, transmission line use, *etc.*, are used. Variations in such factors would affect the service for any particular receiver in any particular location." Nevertheless, it found the propagation curves sufficiently dependable to determine that the signal into Greenville would be "stronger" from Paris Mountain than from Hogback and "slightly stronger" under the modification permit than under the special temporary authorization.

24. Federal Communications Comm. v. WOKO, 1946, 329 U.S. 223, 67 S.Ct. 213, 91 L.Ed. 204; Independent Broadcasting Co. v. Federal Communications Comm., 1951, 89 U.S.App.D.C. 396, 193 F.2d 900.

Mountain. In the background of. that issue lurks the question which seems always to arise when a VHF station invades an area served by UHF stations— whether the newcomer, because of its greater desirability to the networks, will preempt the network programs, to the great economic injury of the older stations.[25] The appellants have expressed fear that a VHF station transmitting from Paris Mountain would provide so strong a signal to their communities as to attract the networks and, consequently, the national advertisers. On that account they protested both the special temporary authorization and the modification permit, while they had made no objection whatever to the grant of the original application calling for a transmitter on Hogback Mountain.

After the original construction permit was granted, intervenor learned that the network would give it no affiliation, because a Hogback operation would overlap the service area of another station with which the network was affiliated. Thereupon, a Paris Mountain site was selected and the network gave intervenor an affiliation for a Paris Mountain operation. If intervenor, at that stage, intended to build a Paris Mountain transmitter, rather than a Hogback Mountain transmitter, it should have applied for a modification permit, rather than for a special temporary authorization. Appellants say intervenor applied for the special temporary authorization instead, because such authorizations are sometimes obtainable rather summarily from the Commission staff, without formal Commission action[26] and without advance public notice, and because, once a station is operating, it is easier to obtain permanent authority. But intervenor's motive is of no consequence. The issue, as the Commission said in its Report and

Order of March 9, 1956, is whether, in applying for the special temporary authorization, intervenor "misrepresented the temporary nature of, or concealed material facts with respect to such operation."

The Commission answered this question in the negative.

■ It declared that, to sustain their burden of showing Spartan's misrepresentation or concealment, appellants were required to prove that Spartan, when it requested the special temporary authorization, had definitely decided to abandon Hogback as the site of its permanent facilities. In our view of the case, their burden was not so heavy. We think it was a misrepresentation for Spartan to assure the Commission that its intention was to locate its permanent transmitter on Hogback if, in fact, there was no fixed intention, but rather complete indecision whether or not it would do so.

■ The Commission found that (1) in the two month period specified in the construction permit for commencement of construction, intervenor "took no steps looking toward construction on Hogback," but did negotiate for property on Paris; (2) "CBS never intended to award Spartan the affiliation on the basis of the Hogback Mountain site"; (3) "It is difficult to determine from the record as a whole" that CBS did anything "to leave a doubt in the mind of Spartan's president on the [latter] proposition";[27] (4) when he requested the special temporary authorization, Spartan's president "had not yet reached a decision" whether he would or would not abandon Hogback as the permanent site and in speaking to a CBS representative he reserved that decision until later; (5) no such indecision was expressed to the Commission in the request, which sought tempo-

25. See Greylock Broadcasting Co. v. United States, 1956, 97 U.S.App.D.C. 414, 231 F.2d 748; Coastal Bend Television Co. v. Federal Communications Comm., 98 U.S.App.D.C. 251, 234 F.2d 686; Van Curler Broadcasting Corp. v. United States, 98 U.S.App.D.C. 432, 236 F.2d 727.

26. Section 0.241 of the Commission's Rules, 1 Pike & Fischer Radio Reg. 51:-64c.

27. Indeed, the Commission concluded that Spartan's purpose in moving to Paris Mountain was to obtain a CBS affiliation.

rary authorization "pending completion of the [Hogback] facilities"; and (6) the special temporary authorization was granted upon intervenor's express representation that it was only for an interim operation pending construction of its permanent facilities on Hogback.[28]

On the basis of those findings, only one conclusion is possible—that Spartan concealed from the Commission and, by clear implication, misrepresented material facts concerning its proposal. The Commission's contrary conclusion is grounded upon a mistaken concept that there is no duty to disclose to the Commission any facet of a proposal as to which there may be a mental reservation, no matter how far advanced the proposal or rudimentary the reservation. There are no findings that Spartan was frank in its dealings with the Commission and, if there were such findings, they would be altogether unsupported by the evidence.

■ Spartan's misrepresentation to the Commission cannot be considered nugatory on any theory that the Commission would have acted similarly even if the truth had been revealed.[29] "The fact of concealment may be more significant than the facts concealed. The willingness to deceive a regulatory body may be disclosed by immaterial and useless deceptions as well as by material and persuasive ones. We do not think it is an answer to say that the deception was unnecessary and served no purpose." Federal Communications Comm. v. WOKO, 1946, 329 U.S. 223, 227, 67 S.Ct. 213, 215, 91 L.Ed. 204. Nor would it matter if Spartan's lack of candor were intended to deceive the Columbia Broadcasting System rather than the Commission. In the WOKO case as well, "the purpose of the concealment was to pre-

vent the facts from becoming known to Pickard's Columbia colleagues." Id., 329 U.S. at pages 225–226, 67 S.Ct. at page 214.

■ Our conclusion that Spartan misrepresented its proposal does not automatically result in disqualification. The basis of a disqualification for lack of candor is that the guilty party may be unworthy of the reliance which the Commission necessarily places on its licensees. Spartan's misrepresentation was calculated, deliberate and not insignificant, but whether the Commission should, on that account, place less reliance on Spartan as a licensee is a question which should be decided in the first instance by the Commission itself. Federal Communications Comm. v. WOKO, 329 U.S. at page 229, 67 S.Ct. at page 216.

### III. Conclusion

Having decided that the Commission committed error in rejecting the propagation curves as evidence and in concluding that intervenor was not guilty of misrepresentation, we set aside the Commission's delete order of March 9, 1956, affirming that grant.

We have pointed out that, with the propagation curves in evidence, the record shows the modification is a curtailment of service to the Spartanburg area which, unless outweighed by other factors, is not in the public interest. But we have no way of determining from the record whether service curtailment may be outweighed by other factors pointing toward, rather than away from, public interest. As we have said, such a question is for the Commission's consideration, as is also the question whether intervenor's misrepresentation so far deprives it of reliability as to disqualify it as a licensee.[30] For consideration of

---

28. This representation by Spartan became necessary, when appellants, objecting to the grant of the special temporary authorization, alleged upon information and belief that "Spartan intends to use the Paris Mountain site on a permanent basis and to abandon the Hogback Mountain site, and that CBS does not intend to affiliate with Spartan unless it does so."

29. The Commission said the issue was whether "Spartan obtained from the Commission an STA *upon the basis* of misrepresentations of fact."

30. Supra note 6. Whether if the Commission determines that no modification permit will be granted, the intervenor's mis-

those questions, the case is remanded to the Commission.

Reversed and remanded.

representation may serve to vitiate the original construction permit is not before us. That question also would be for the Commission's consideration.