**CAPITAL AIRLINES, INC., Petitioner**

v.

**CIVIL AERONAUTICS BOARD, Respondent,**

**City and Chamber of Commerce of Toledo, Ohio, Intervenor.**

**No. 15475.**

United States Court of Appeals District of Columbia Circuit.

Argued May 12, 1960.

Decided July 11, 1960.

Mr. Macon M. Arthur, Washington, D. C., with whom Messrs. Robert B. Hankins and James H. Bastian, Washington, D. C., were on the brief, for petitioner.

Mr. Morris Chertkov, Attorney, Civil Aeronautics Board, with whom Messrs. Franklin M. Stone, General Counsel, Civil Aeronautics Board, John H. Wanner, Deputy General Counsel, Civil Aeronautics Board, O. D. Ozment, Associate General Counsel, Litigation and Research, Civil Aeronautics Board, and Richard A. Solomon, Attorney, Department of Justice, were on the brief, for respondent.

Mr. William C. Burt, Washington, D. C., for intervenor. Mr. Robert M. Beekman, Washington, D. C., also entered an appearance for intervenor.

Before BAZELON, WASHINGTON and BASTIAN, Circuit Judges.

BAZELON, Circuit Judge.

This case raises a new and important question in the administration of the Federal Aviation Act. It is the first proceeding in which the Civil Aeronautics

Board has found a certified carrier's service to be inadequate and has ordered it to provide additional flights.[1]

The City and Chamber of Commerce of Toledo, Ohio, filed a joint complaint before the Board alleging that Capital Airlines ("Capital") was not rendering Toledo adequate service to and from New York, Chicago, Philadelphia and Cleveland, as required by § 404(a) of the Act.[2] The Board ordered an investigation and consolidated it with an investigation, ordered sua sponte, concerning United Air Lines' ("United") air coach service [3] between Toledo and the same four cities. The examiner found that United's service was adequate and dismissed the proceeding as to it. But he found that Capital's service to New York, Chicago and Philadelphia (but not Cleveland) was inadequate and recommended that Capital institute, for a one-year trial period, two daily round-trip air coach flights (one during daylight hours) to each of these three cities. The Board affirmed and issued the recommended order.[4] Capital has petitioned for review contending, *inter alia*, that the Board's subsidiary findings do not support its ultimate determination of inadequate service; that the remedy ordered is in excess of the Board's authority and, in any event, is not warranted by the record.

Capital, one of twelve trunk-line domestic air carriers, has been authorized since 1947 to provide first class or coach flights from Toledo to New York and Chicago. Since 1955, this authorization has included non-stop flights to these points as well as non-stop service to Philadelphia. Capital has never flown coach flights between Toledo and any of these three cities. It has never rendered any through schedule service (i. e., without change of plane) between Toledo and Philadelphia. For a short time in 1955 and 1956, it had one and one-half through schedule round trips per day to New York, and Chicago. At the time of the hearing in the instant case, Capital provided no service of any kind to Philadelphia, and its service to New York and Chicago had dwindled to one east-bound (Chicago-Toledo-New York) and one west-bound flight per day, each of which entailed a change of plane and a long layover.

By contrast, United offered at the time of the hearing three first class round-trip flights daily to New York; five and one-half to Chicago; one to Philadelphia. Only a few required a change of plane; many were non-stop.

Capital contends that the order must fall because the Board's determination, that Capital's service is inadequate, was made without finding that "the existing air services [of all carriers] in the markets at issue do not satisfy the reasonable requirements of the travelling public." In other words, the Board made no finding that Toledo passengers could not find space aboard United's single-plane flights. To this the Board responds that such a finding is unnecessary, for if two carriers are certificated to service a market, *each must render adequate service*, and "the fact that the aggregate of serv-

---

1. With major trunk-line air service now well established, the Board will be increasingly concerned with securing adequate service for smaller, intermediate cities. The problem is discussed in Comment, *Adequacy of Domestic Air Line Service*, 68 Yale L.J. 1199 (1959).

2. "It shall be the duty of every air carrier to provide and furnish interstate and overseas air transportation, as authorized by its certificate, upon reasonable request therefor and to provide reasonable through service in such air transportation in connection with other air carriers; to provide safe and adequate service, equipment, and facilities in connection with such transportation * * *." 72 Stat. 760 (1958), 49 U.S.C.A. § 1374(a).

3. The scheduled air services are divided into two general price categories—first class and coach services. Carriers are permitted to provide coach services at fares approximately 75 per cent of the first class fares. Coach service must be operated in either high seating density equipment or, if operated with first class seating equipment, be scheduled during less convenient off-traffic hours.

4. The Board directed Capital to commence service January 11, 1960. This court refused a stay and the required service has been provided since that date.

ice is adequate does not necessarily absolve the carrier whose services are inadequate." More specifically, the Board contends that where, as here, it certificated Capital to serve Toledo in order to provide a competitive spur to United,[5] Capital's duty of service cannot be discharged by United's adequate service.

The Board's argument rests upon 404(a)'s directive that "It shall be the duty of *every* air carrier to provide and furnish * * * air transportation, as authorized by its certificate, upon reasonable request therefor and * * * to provide * * * adequate service" (emphasis supplied). It recognizes that "in determining service adequacy of a particular carrier, one of the factors to be considered [is] the aggregate of services offered by other air carriers in the markets in question." See Fort Worth Investigation, Docket No. 7382, decided Sept. 23, 1958. But it held that where a carrier is authorized to provide competitive service and never even *attempts* to comply, the fact that other carriers provide a market with minimally adequate service does not discharge the offending carrier's obligations under its certificate. In short, the Board held that the Act must be read as a whole and that the purposes for which a carrier is certificated are relevant to the duty of service imposed by § 404(a).

We think the Board has properly construed the Act. As the Board noted, § 404(a) requires every carrier to provide "air transportation, as authorized by its certificate" and to provide adequate

service and facilities "in connection with *such* transportation" (i. e., the transportation authorized by the certificate). A carrier may be certificated, upon request, if the Board finds that it "is fit, willing, and able to perform such transportation properly" and that "such transportation is required by the public convenience and necessity." 72 Stat. 754 (1958), 49 U.S. C.A. § 1371(d). In determining the public interest, the Board must observe the congressional declaration that the public convenience and necessity are enhanced by:

"The promotion of adequate, economical, and efficient service by air carriers at reasonable charges * * *" 72 Stat. 740 (1958), 49 U.S.C.A. § 1302(c).

and

"Competition to the extent necessary to assure the sound development of an air-transportation system * * *" 72 Stat. 740 (1958), 49 U.S.C.A. § 1302(d).

We do not decide whether a certificated carrier can be required to undertake competitive service where it can show that the potential market is *completely* satisfied and that service could only be instituted at a hopeless loss.[6] That is not this case. Here the Board found, upon substantial evidence that, even if Capital's and United's combined service to Toledo is not legally inadequate, there is a potential demand for service between Toledo and New York, Chicago and Philadelphia which is not being fulfilled.[7] Although the Board did

---

5. Capital challenges the Board's assertion that it, the Board, removed various restrictions from Capital's certificates in 1955 for the purpose of enabling Capital to compete more effectively with United in these markets. We think that Capital's representations at the time justified the Board in its belief that Capital would render better service in competition with United if the restrictions were removed. We also agree that this was a substantial factor in the Board's decision to favor Capital for this unrestricted service over other appellants. See New York-Chicago Service Case, 22 C.A.B. 973, 985 (1955) ("We also take note of

Capital's interest in promoting coach service and its effectiveness as a competitive spur in markets of this size.")

6. See discussion in Fort Worth Investigation, Docket No. 7382, decided Sept. 23, 1958, concerning Braniff's service between New York and Fort Worth.

7. For example, the examiner found that in March of 1957, only 61 per cent of business trips between Toledo and these cities was by air, compared with 83 per cent between Toledo and all other points. In 1957 Toledo ranked 39th among major metropolitan areas in effective buying income but 55th in number of

not attempt to estimate the precise size of this potential market, we think it was fully justified on the record before it in concluding that the existence of more adequate Capital services, plus the expected improvement in United's service as a result of competition, would generate the demand necessary to sustain Capital's new flights.[8] Moreover, the Board's estimates, also supported by substantial evidence, show that Capital will be able to provide the ordered service without incurring economic loss. If these predictions prove to be erroneous, Capital will have full opportunity at the end of the one-year trial period to demonstrate that the market can not sustain the service.[9]

■ Capital strenuously protests the Board's remedy on the ground that it requires air coach rather than first class service. Capital, however, has never put forward an alternate proposal and, on the facts of this case, we think the remedy falls well within the Act and the Board's discretionary authority. See Jacob Siegel Co. v. Federal Trade Comm'n, 1946, 327 U.S. 608, 66 S.Ct. 758, 90 L.Ed. 888. The examiner found that the only planes which Capital had available were older, fully depreciated, and not suitable for first class service. Rather than force Capital to compete for first class fares against United's newer equipment, he ordered the coach flights. He noted that Capital had been certificated for the Toledo market because it was a pioneer in

air coach service and that the Board was on record as favoring this lower-fare service in the public interest. Finally, he found that Toledo families and economy-minded business men would be likely to avail themselves of air coach service, and that on the relatively short hauls even business men who normally fly first class would be more interested in frequent flights than luxuries.

■■ We do not agree that the order violated § 401(e), which provides that "No term, condition, or limitation of a certificate shall restrict the right of an air carrier to add to or change schedules, equipment, accommodations, and facilities for performing authorized transportation * * *." That provision must be read in harmony with the rest of the Act. Section 404(a) requires a carrier to provide "safe and adequate service, equipment, and facilities" and § 1002(c) authorizes the Board to issue "an appropriate order" of compliance if it finds that any carrier has failed to observe the requirements of the Act.[10] Capital's argument would emasculate § 404(a), and we are bound to avoid such an absurd result. The Board can not effectively order a delinquent carrier to provide more adequate service unless it can specify in detail what constitutes minimally adequate service. This is so because "Carriers do not provide, and members of the public do not use service in general; transportation services and

---

passengers and 60th in volume of passenger miles generated. Six of Toledo's neighboring cities (Cleveland, Cincinnati, Columbus, Detroit, Indianapolis and Pittsburgh) develop 61 per cent more passengers per 1,000 in population than Toledo.

8. The Board adopted the examiner's finding that Capital's withdrawal of service from that in effect in 1955 and 1956 "can not be ascribed to failure of patronage." Rather, he determined that "Capital has decided as a matter of company policy to concentrate its efforts on the richer segments and neglect the lesser markets." Such "skimming-the-cream" he found inconsistent with Capital's obligation as a trunk line carrier with its high-density, long-haul routes pro-

tected from competition by non-scheduled airlines.

9. It has also been open to Capital to seek abandonment of its authority to serve Toledo, but it has not so elected. 72 Stat. 754 (1958), 49 U.S.C.A. § 1371 (j).

10. "If the Administrator or the Board finds, after notice and hearing, * * * that any person has failed to comply with any provision of this chapter or any requirement established pursuant thereto, the Administrator or the Board shall issue an appropriate order to compel such person to comply therewith." 72 Stat. 788 (1958), 49 U.S.C.A. § 1482 (c).

transportation needs inherently pertain to movements of traffic between specific pairs of points. * * * questions [of adequacy] largely turn on the details of available services and traffic needs in the particular market." Fort Worth Investigation, supra.

We have carefully considered the other objections which Capital raises and find them without merit. The Board's order is accordingly

Affirmed.