TELEVISION CORPORATION OF MICHIGAN, INC., Appellant,

v.

FEDERAL COMMUNICATIONS COMMISSION, Appellee,

Wood Broadcasting, Inc., Intervenor.

No. 16253.

United States Court of Appeals District of Columbia Circuit.

Argued June 6, 1961.

Decided July 13, 1961.

Mr. Leo Resnick, Washington, D. C., for appellant.

Mr. Daniel R. Ohlbaum, Asst. General Counsel, Federal Communications Commission, with whom Messrs. Max D. Paglin, General Counsel, Federal Communications Commission, and Edward W. Hautanen, Counsel, Federal Communica-

tions Commission at the time the brief was filed, were on the brief, for appellee.

Mr. Harold David Cohen, Washington, D. C., with whom Mr. Thomas N. Dowd, Washington, D. C., was on the brief, for intervenor.

Before WILBUR K. MILLER, Chief Judge, and BAZELON and WASHINGTON, Circuit Judges.

WASHINGTON, Circuit Judge.

This is a television case, involving the shift of a transmitter to a new site, thus changing the area served.

Station WOOD-TV began operating in 1953 with a transmitter located some 10 miles northeast of Grand Rapids, Michigan, the city to which it was assigned. It there served Muskegon as well as Grand Rapids, plus a large rural area between the two cities and to the sides. In 1959, Station WOOD-TV applied for a construction permit to build new transmitting facilities at a site located about 20 miles southeast of Grand Rapids. This was granted by the Federal Communications Commission without a hearing. A protest was promptly filed by Television Station WILX-TV, located in Onondaga, Michigan, alleging that to shift WOOD's transmitter to the new location would result in added competition for WILX, and that the revenues of WILX would decrease.[1] WILX also alleged that the area originally served by WOOD, from its first transmitter, would lose much of the service so supplied. WOOD opposed the protest, alleging among other things that the shift in transmitter site would improve service to Grand Rapids and would enable WOOD to serve a larger population. The Commission ordered an evidentiary hearing and postponed the effective date of the grant.

After the hearing, at which much evidence was received, the Hearing Examiner held that the shift in site should be permitted. WILX filed some 31 exceptions. The Commission, after argument, affirmed the grant by a vote of 4 to 2. This appeal followed.

Appellant's central contention is succinctly expressed in the dissenting statement of Commissioner Bartley, who says:

"I dissent. In my opinion, moving a station from an underserved population area to a more adequately served population area, as here, is not *in* the public interest—it is *contrary* to the public interest."

In like vein, the dissenting statement of Commissioner King says:

"I would reverse the Initial Decision and deny the application of WOOD-TV to move its transmitter to a new site.

"The Hall case [Hall v. Federal Communications Commission, 99 U.S.App.D.C. 86, 237 F.2d 567], like this one, involved a transmitter move which would have increased service to some areas at the expense of eliminating or downgrading service elsewhere. The Court of Appeals said it was 'axiomatic' that such a curtailment of service was not in the public interest, but might be 'offset by concomitant factors.'

"In this case, the only concomitant factor advanced is that 103,000 more people will be served by WOOD-TV than at present. *At least 100,000 of these people already have available to them two or more television services.*

"In my opinion, this is insufficient to offset the 'axiomatic' proposition that it is not in the public interest to eliminate altogether any service to some 900 people, to reduce from 2 to 1 the services available to 42,000 people, and to downgrade the only service available to the 85,000 residents of the Muskegon urbanized area.

"The majority opinion refers to the fact that two other channels have

---

1. The protest was filed under the then provisions of Section 309(c) of the Communications Act of 1934, 48 Stat. 1085, as amended, 47 U.S.C.A. § 309(c).

been allocated to Muskegon. It should be noted that both of these channels are in the UHF band."

The Commission's opinion says that it has permitted WOOD to move from a "less densely populated" area north of Grand Rapids, less well served by television stations, to "areas in the south which are more densely populated and receive more television signals. The proposed [Grade B] contours would encompass a population total greater by 103,000 persons than the present ones." [2] The Commission goes on to say, among other things:

"This is clearly in the public interest. It is therefore, necessary to consider whether this factor is offset by concomitant adverse factors. With regard to the white [unserved] area which would be created, the small area and population involved (less than 900 persons), makes the relative public importance of this loss a minor factor. The downgrading of service to Muskegon is more than outweighed by the expected increase of 130,000 in the total number of persons within the WOOD-TV Grade A contour, particularly when account is taken of the fact that two television channels are allocated to Muskegon by the Commission's Rules. The most serious problem is the loss of a choice of service to areas encompassing a net total of 42,000 persons. Although serious, this loss does not outweigh the benefits of the gain of an additional service to almost two and one half times as many persons even though most of them already have multiple services available."

■ It is apparent that the Commission has started with the premise that more service to more people—even to a group already well served—is prima facie desirable, and that it must then consider whether this advantage is offset by the

negative factor of loss of service by others. Our Hall opinion expressed the opposite approach—that deprivation of service to any group was undesirable, and to be justified only by offsetting factors. See 99 U.S.App.D.C. 86, at page 91, 237 F.2d 567, at page 572. The difference is not merely one of words. It is basic to the Commission's approach to its task. Section 1 of the Communications Act of 1934, 47 U.S.C.A. § 151, directs the Commission to make radio facilities (and presumably television also) available as far as possible to "all the people of the United States." Section 307(b) of the Act, 47 U.S.C.A. § 307(b), repeats this mandate, stressing that the Commission shall provide a "fair, efficient, and equitable distribution" of service "among the several States and communities." The general intention of Congress is clear. The Commission sought to implement it in its Sixth Report and Order of April, 1952,[3] where it established the following priorities:

"Priority No. 1: To provide at least one television service to all parts of the United States.

"Priority No. 2: To provide each community with at least one television broadcast station.

"Priority No. 3: To provide a choice of at least two television services to all parts of the United States.

"Priority No. 4: To provide each community with at least two television broadcast stations.

"Priority No. 5: Any channels which remain unassigned under the foregoing priorities will be assigned to the various communities depending on the size of the population of each community, the geographical location of such community, and the number of television services available to such community from television stations located in other communities."

2. That the Commission was here referring to the Grade B service area appears from the Commission's brief and from the Examiner's findings.

3. 17 Fed.Reg. 3905 at 3912; Vol. I (Part 3) Pike & Fischer Radio R. 91.599 at 91.620.

Neither the statutory sections nor the "priorities" express rigid and inflexible standards: the Commission has a broad measure of discretion in dealing with the many and complicated problems of allocation and distribution of service. Logansport Broadcasting Corp. v. United States, 1954, 93 U.S.App.D.C. 342, 346, 210 F.2d 24, 28. But in the present case the Commission's action would seem prima facie contrary to Priorities 1 and 3, because it would deprive about 900 people of any service, and deprive about 42,000 people of all but one service. The Commission puts against this, in the first place, the increase of 103,000 in the total number of persons within the WOOD-TV Grade B contour. But this latter figure is not analyzed. Actually, the record shows it is obtained by subtracting a total of 97,000 persons who will lose Grade B service from a total of 200,000 persons who will gain Grade B service. The Commission's discussion of the needs of the 97,000 persons who would lose Grade B service, and the comparative needs of those who would gain service, is quite inadequate. Another figure used by the Commission is that of 130,000 persons who would gain Grade A service. This figure is reached by subtracting a total of 155,919 persons who would lose all or some Grade A service (114,456 of whom would lose all Grade A service) from a total of 285,294 persons who would gain Grade A service (only 6,881 of whom are presently without any Grade A service). The needs of the 114,456 persons who would lose all Grade A service are not discussed. Nor are the comparative needs of the 285,294 gainers adequately discussed. The net figures of 130,000 and 103,000 are left largely unexplained. The principal losers appear to be the people of Muskegon. As to them, the Commission points out that "two television channels are allocated to Muskegon

by the Commission's Rules." But it does not add that these are UHF channels, nor does it discuss whether there is any likelihood of their coming into service.[4]

The Commission's conclusion as to added service, and that this is "clearly in the public interest," accordingly seems to us to lack adequate explanation. As we said in the Telanserphone case:

"The expression of a bare conclusion * * * does not reveal 'the basis' for the conclusion required by 47 U.S.C. § 409(b) (1952), 66 Stat. 721 (1952), 47 U.S.C.A. § 409(b). The statutory duty of this court to review the action of the Commission cannot be performed without a fuller statement of its reasons for its conclusion." Telanserphone, Inc. v. Federal Communications Commission, 1956, 97 U.S. App.D.C. 398, at page 401, 231 F.2d 732, at page 735.

Adequate explanation may perhaps be forthcoming: we are not saying that the Commission may not in the end be able to justify the result it has reached. We think, however, that it has not so far done so.

A further comment may be noted. All too often in cases like the present the broadcasters involved appear to be chiefly interested in the revenues to be derived from operating their stations in the most profitable manner. It seems clear in the present case that WOOD-TV will make more money in its new location than in the old: it is moving to a more prosperous and more highly populated area, and its advertising revenues will no doubt increase. But such considerations, though legitimate, cannot be controlling.[5] Television and radio are affected with a public interest: the Nation allows its air waves to be used as a matter of privi-

---

4. Not to be overlooked is the fact that the original grant was predicated upon the needs of the area to be served from the initial transmitter site, and WOOD-TV received its 1953 award on its proposal to serve that area.

5. Cf. Capital Airlines, Inc. v. C. A. B., 1960, 108 U.S.App.D.C. 215, 219, at note 8, 281 F.2d 48, 52 at note 8.

lege rather than of right. The enterprises which today are profiting so handsomely from radio and television may in the end find it in their own best interest to treat their businesses primarily as a public trust.

We will reverse the Commission's order and remand the case for further proceedings not inconsistent with this opinion. The Commission may, if it is so advised, preserve the rendition of service to the public by WOOD-TV from either the old or the new transmitter site, pending reconsideration of the case.

So ordered.