**WEST MICHIGAN TELECASTERS, INC., Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

Channel 41, Inc., Permittee of UHF Television Station WUHQ–TV, Battle Creek, Michigan, Intervenor.

No. 71–1007.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 9, 1971.

Decided Jan. 24, 1972.

As Amended on Denial of Rehearing March 7, 1972.

---

Mr. Reed Miller, Washington, D. C., with whom Mr. David H. Lloyd and Mrs. Anne W. Branscomb, Washington, D. C., were on the brief, for appellant.

Mr. Charles M. Firestone, Counsel, Federal Communications Commission, with whom Messrs. Richard E. Wiley, General Counsel at the time the brief was filed, John H. Conlin, Associate General Counsel at the time the brief was filed, and Miss Katrina Renouf, Counsel, Federal Communications Commission, were on the brief, for appellee. Mr. Stuart F. Feldstein, Counsel, Federal Communications Commission, also entered an appearance for appellee.

Mr. Forbes W. Blair, Washington, D. C., for intervenor.

Before WRIGHT and WILKEY, Circuit Judges, and A. SHERMAN CHRISTENSEN,[*] U. S. Senior District Judge for the District of Utah.

WILKEY, Circuit Judge:

The principal questions presented for review here are: First, whether the Federal Communications Commission abused its discretion when it denied [1] without a hearing West Michigan Telecasters, Inc.'s application for permission to move the location of its station WZZM–TV's transmitter, involving a request for a waiver of the Commission's Rules establishing minimum mileage separation between co-channel television stations; and, Second, whether the Commission set forth adequately the grounds for its decision here.

West Michigan is the licensee of VHF television station WZZM–TV in Grand Rapids, Michigan, channel 13, and is an affiliate of the ABC television network. On 27 May 1969 West Michigan filed an application with the FCC for permission to move station WZZM–TV's transmitter to a new location, approximately 155 miles from station WSPD–TV's transmitter in Toledo, Ohio, also operating on channel 13. West Michigan thus asked for a waiver of the Commission's mileage separation rule, which requires that West Michigan's transmitter be located at least 170 miles from the transmitters of any other stations which operate on channel 13, to protect these co-channel stations from interference.[2] To place this waiver request in proper perspective, it is necessary to review the background of television station allocation in the Grand Rapids area.

The Commission assigned channel 13 to Grand Rapids effective 11 September 1961.[3] After considering a variety of possible options, including a proposal that channel 13 be assigned to Grand Rapids but that any licensee be permitted to locate its transmitter at a short-spaced (within 170 miles of the transmitter of a co-channel) site south of Grand Rapids and north of Kalamazoo (although including the latter in terms of coverage), the FCC made the allocation "on the basis that a station will be located at standard separations [at least 170 miles from a co-channel's transmitter]—roughly 25 miles northwest of Grand Rapids—and provide principal city service to that city and also to the sizeable metropolitan area of Muskegon."[4] The Commission added:

> We are persuaded that, on the basis of the comments herein and the 1960 Census data . . ., the public interest is better served by providing an assignment which will provide principal city service to Grand Rapids and Muskegon, at standard separations, than by providing an assignment—necessarily at short spacings—which would serve Grand Rapids and Kalamazoo, as do the two stations now in the market. In this connection, we have taken into account the fact that the Muskegon area is now nearly as populous as the Kalamazoo area; the shorter distance from Grand Rapids to Muskegon than from Grand Rapids to Kalamazoo, which would indicate that Grand Rapids-Muskegon constitutes one "market," with common interests, at least to the same extent as Grand Rapids-Kalamazoo; and the fact that Kalamazoo and environs have or will shortly have available two television services of principal-city grade and

---

[*] Sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

[1.] Memorandum Opinion and Order adopted 29 April 1970, 22 FCC 2d 943, and Memorandum Opinion and Order adopted 2 December 1970 denying reconsideration of the earlier Order, 26 FCC 2d 668.

[2.] 47 CFR 73.610(b); See also Sixth Report on Television Allocations, 41 FCC 142 (1952).

[3.] Television Allocations in Grand Rapids, Michigan, 41 FCC 908 (1961).

[4.] Id., at 915.

another Grade B or better, whereas the Muskegon area now has available no service of principal-city grade and much of this area has available only two services of Grade B or better.[5]

Also on 11 September 1961 the Commission adopted a general Report and Order, *Interim Policy on VHF Television Channel Assignments,* in which it found "a pressing urgency for the addition of a third service" in ten specified markets and thus decided that it would consider short spacing as an interim measure to bring initial or additional television, preferably local, service to those markets.[6] In 1962, however, Congress passed the all channel receiver legislation,[7] which provided the means for resolving the difficulties which the FCC's *Interim Policy, supra,* had attempted to meet. The Commission thus abandoned the latter and adopted the policy, presently in force, of achieving unfulfilled television allocations objectives principally through the assignment of UHF stations at standard spacing where needed.[8] The Commission then assigned, on 9 February 1966, UHF channel 41 to Battle Creek, Michigan. This channel is intended to bring a third primary network service to Kalamazoo, which West Michigan's channel 13 was not allocated to serve[9] in light of the spacing separation problems which would otherwise have arisen.

West Michigan, in its application of 27 May 1969 to move its transmitter to a short-spaced site 30 miles to the southwest of its present location, in order to be in a position to provide Grade B service to Battle Creek and Kalamazoo, presented the following as grounds for its request that the Commission waive its mileage separation rule and permit it to change the location of its transmitter:

(1) West Michigan would provide equivalent protection against interference to co-channel 13, station WSPD–TV, in Toledo, Ohio.

(2) West Michigan currently suffers a serious competitive imbalance vis-a-vis station WOOD–TV in Grand Rapids and station WZKO–TV in Kalamazoo, which reach 32–33% more homes in the Grand Rapids-Kalamazoo market than does station WZZM–TV.

(3) Station WZZM–TV's meritorious local programming would be extended to a large gain area in Kalamazoo, Battle Creek and other areas.

(4) The change in transmitter site proposed by West Michigan would have a beneficial impact on the development of commercial UHF and educational television since West Michigan would give its present transmitter site and tower to any UHF applicant who could make use of it, and would allow Wolverine Educational Television Corporation to use its new facilities at no cost.

The Commission, however, found that the facts advanced by West Michigan in support of these allegations did not, even if true, justify waiver of the mileage separation rule and thus concluded that a hearing on the application was not necessary. For the reasons discussed below, we affirm the Commission's decision.

5. *Id.*

6. 21 RR 1695, 1696–1697, reconsideration denied 21 RR 1710 (1961). The FCC, however, later terminated proceedings in seven of these markets in the belief that the long range allocation system employing UHF assignment was preferable to the patchwork method of short spacing. Television Assignments—Third Service, 41 FCC 1119, 1124 (1963).

7. 47 U.S.C. §§ 303(s) (*"Powers and duties of [the Federal Communications] Commission"*), 330 (*"Prohibition against shipment of certain television receivers"*) (1962).

8. Deinmixture Cases, 23 RR 1645 (1962); Television Assignments—Third Service, see note 6, *supra.*

9. Except by means of a television broadcast translator service, which rebroadcasts channel 13's programs in Kalamazoo.

## I.

Under Section 309 of the Communications Act,[10] the FCC may grant an application without a hearing if no substantial and material questions of fact are presented in regard to whether a grant would serve the public interest. Conversely, if such questions are presented, the Commission is required by the Act to hold a hearing on the application. The FCC may, however, establish rules of general applicability and dismiss an application which requires waiver of a rule without a hearing if the accompanying papers do not set forth sufficient reasons, if true, to justify waiver of the rule.[11] As the Commission has noted with respect to the burden of demonstrating sufficient basis for waiver:

> Since our rules presumptively serve the public interest [the rule here— Section 73.610(b)—is designed to prevent co-channel interference with television service to the public], those seeking their waiver have the burden of establishing that the public interest is better served, on the facts presented, by a waiver than by an application of the appropriate rules. Meeting that burden, of course, becomes more difficult as the deviation from the standards specified in the rules *increases*.[12]

While, on the other hand, as the court in WAIT Radio v. FCC observed, "A general rule, deemed valid because its overall objectives are in the public interest, may not be in the 'public interest' if extended to an applicant who proposes a new service that will not undermine the policy, served by the rule, that has been adjudged in the public interest."[13] It went on to find:

> An agency need not sift pleadings and documents to identify such applica-

tions, but allegations . . ., stated with clarity and *accompanied by supporting data,* are not subject to perfunctory treatment, but must be given a "hard look." [14]

■ As such, the requirement that those seeking waiver of a Commission rule substantiate their applications with sufficient basis to demonstrate that waiver would be in the public interest, is not revoked. Instead, the FCC is directed to consider in detail such requests when accompanied with supporting data.

### A.

■ West Michigan demonstrates in the instant case that waiver of the Commission's mileage separation rule would not harm the public interest since West Michigan's technical proposal, agreed to by WSPD–TV and to be implemented in the event of Commission approval of West Michigan's request to move its transmitter location to within 155 miles of station WSPD–TV's transmitter site, would provide equivalent protection from co-channel interference to WSPD–TV.

As West Michigan itself recognizes, however, the equivalent protection it would afford in the event of Commission approval merely constitutes satisfaction of a threshold requirement for its application here. That is, if it had not offered to provide such protection, it would have been barred at the outset and summary dismissal of its waiver request justified. Thus, West Michigan's offer of equivalent protection simply has the effect of permitting it to attempt to support its application for permission to change the location of its transmitter on the basis of the following allegations.

### B.

■ West Michigan argues that it suffers a competitive handicap in regard

---

10. 47 U.S.C. § 309(d) (*"Application for license—Considerations in granting application"*) (1964).

11. United States v. Storer Broadcasting Co., 351 U.S. 192, 205, 76 S.Ct. 763, 100 L.Ed. 101 (1956).

12. Carolina Broadcasting Co., 18 FCC 2d 482, 483–484 (1969).

13. 135 U.S.App.D.C. 317, 321, 418 F.2d 1153, 1157 (1969).

14. *Id.* (emphasis added).

to the other VHF television stations in the Grand Rapids-Kalamazoo area. As noted above, however, the FCC, in allocating channel 13 in Grand Rapids to West Michigan in 1961, provided that "the public interest is better served by providing an assignment which will provide principal-city service to Grand Rapids *and Muskegon,* at standard separations, than by providing an assignment —necessarily at short spacings—which would serve Grand Rapids *and Kalamazoo,* as do the two stations now in the market." [15] The balance which the Commission sought to achieve thereby was specifically *not* identical coverage by all three VHF stations in the Grand Rapids area, but instead principal-city coverage at standard spacings by the existing stations (WOOD–TV and WKZO–TV) of the southern portion of the area (Grand Rapids and Kalamazoo), and by the new channel (WZZM–TV) of the northern portion (Grand Rapid and Muskegon).[16]

It has not been demonstrated that circumstances have changed to such an extent to justify Commission approval of West Michigan's request to move WZZM–TV's transmitter away from a position in which it provides principal-city service to Grand Rapids and Muskegon at standard spacings. Furthermore, the all channel receiver legislation adopted by Congress in 1962, *supra,* provided the FCC with the opportunity to abandon such interim measures as deinmixture and short spaced drop-ins and to turn to UHF assignments in VHF markets (as the Commission has done in the Grand Rapids area by assigning channel 41 to it) as a means of resolving its allocations difficulties.

In addition, the Grand Rapids-Muskegon market is such that WZZM–TV's operations have always been profitable— its net income after taxes was $159,036 in 1967, $216,951 in 1968, and $72,883 in the first quarter of 1969. West Michigan's public service programming has also earned WZZM–TV several Michigan Associated Press awards. Thus, the assignment to Grand Rapids of channel 13 at standard spacing has achieved the Commission's objectives of 1961—providing the Grand Rapids-Muskegon area with a viable and high quality primary television service.

West Michigan's assertion that its future viability may be endangered, by the Commission denying its request to move its transmitter site and by the Commission's revocation of West Michigan's Kalamazoo translator service permit,[17] is inappropriate for consideration here. If West Michigan is seriously threatened or in fact adversely affected by either of these occurrences, it may then seek to present sufficient evidence of such detrimental impact to warrant Commission, and possibly judicial, review and relief, if such is found to be required. In light of West Michigan's record of viable and high quality operation, however, the record here does not now call for such review. While West Michigan's application for permission to move its transmitter site no doubt reflects its desire to partake of the more lucrative Grand Rapids-Kalamazoo market, as the Commission noted in *Triangle Publications, Inc. (WHNC–TV),*

[W]e are not generally concerned with the competitive status of licensees and are not insurers of lucrative operations. We are, however, concerned with the public interest and do become concerned with a licensee's competitive situation when a threatened injury to such licensee could result in a detriment to the public interest.[18]

15. See note 3, *supra.*

16. See *id.*

17. West Michigan's counsel revealed at oral argument before the court on 9 December 1971 (Docket No. 71–1007) that the Commission had ordered during the week of 29 November 1971 that West Michigan take out station WZZM–TV's Kalamazoo translator service.

18. 29 FCC 315, 318 (1960), aff'd *sub nom.,* Triangle Publications, Inc. v. FCC, 110 U.S.App.D.C. 214, 291 F.2d 342 (1961).

In the instant case, however, there are no such indications of injury to WZZM–TV's record of profitable operations demonstrated.

### C.

While West Michigan contends that its proposal to relocate its transmitter would permit it to extend its service to an additional 385,116 people within its predicated Grade B contour, this would also result in a *loss* of service to 89,182 persons, of whom 49,718 presently receive no service of greater than Grade B intensity and that from only two other television stations. Furthermore, as the Commission noted in its opinion in this case,

> Since these losses are *prima facie* inconsistent with the public interest, Hall v. FCC, 99 U.S.App.D.C. 86, 237 F.2d 567 (1954), a strong showing of other factors must be present before the Commission could grant this request for waiver. A substantial portion of the predicted gain area that does not presently receive Grade B coverage from the ABC network will receive that service from the improved facilities of ABC affiliate station WSJV–TV, Channel 22, Elkhart-South Bend, Indiana, and possibly from the proposed operation of Channel 41 in Battle Creek [also to be an ABC affiliate]. We conclude, therefore, that the loss to 49,718 people of their third Grade B signal caused by the proposed move is not offset by alleged gains in an area of multiple signals.[19]

▆▆▆ Since, in view of the Commission's policy, sustained by this court, Hall v. FCC, *supra,* that losses in service are *prima facie* inconsistent with the

public interest, and of the multiplicity of signals already available in the gain area (in contrast to the loss area), West Michigan's shifting of its transmitter location would result in net losses. In addition, despite West Michigan's offer to provide translator service to the loss area, the FCC has found, even where short spacing is not at issue, that "translators cannot compensate for the loss of primary service."[20] And, where short spacing is involved, the Commission has specifically rejected translator service as a practical alternative to direct transmission,[21] in the absence of compelling public interest factors not present here.[22]

Finally, West Michigan's assertion that its meritorious programming would be extended in scope and reach if the FCC permitted its request to shift its transmitter site is-met by pointing out that the loss of access to such programming by 89,182 persons, as noted above, would produce net losses, since many of these people would thereby lose their only ABC programming and would be restricted in choice to only two other signals.

### D.

▆ West Michigan's allegations that changing its transmitter location would have a beneficial impact on the development of both commercial UHF and educational television run afoul of the Commission's policy to foster UHF service in that sixty-two percent of the people in the new UHF channel 41's Grade B contour (1,091,791 out of a total of 1,747,146, as stated in channel 41's amended proposal), would also receive WZZM–TV's proposed Grade B service,

---

19. See note 1, *supra,* at 945–46.

20. Central Coast Television (KCOY-TV), 14 FCC 2d 985 (review Bd. 1968), review denied FCC 69–614, reconsideration denied 18 FCC 2d 794, 795 (1969), appeal pending D.C.Cir. Case No. 23,422.

21. The Outlet Company, 18 FCC 2d 528, 530 (1968).

22. Van Curler Broadcasting Corp., 24 RR 1079 (1963); Capital Cities Broadcasting Corp., 24 RR 1067, 1073 (1963).

<br>

thus hampering UHF channel 41's development.[23]

Despite West Michigan's generous offers—to give its present transmitter site and tower to any commercial UHF applicant who could use it, provided FCC approval is secured for West Michigan's proposal to move its transmitter location, and to allow Wolverine Educational Television Corporation to make use of its new transmitter facilities at no cost—the Commission, in protecting the public interest in receiving the best possible service from *all* the channels allocated in the market,[24] can reasonably favor the policy of protecting UHF operations where it conflicts with the policy of improving VHF operations, even to the extent of abrogating a claimed personal right of an existing UHF station.[25] As this court had occasion to observe:

. . . [T]he Commission's long-standing UHF protection policy . . . arose out of the Commission's realization that development of a viable system of UHF broadcasting, which was deemed essential in light of the limited number of available VHF channels, could never become a reality unless and until these UHF stations were offered some sort of protection against their generally more powerful VHF competitors. Thus the Commission devised its UHF preference doctrine as a means to foster optimum conditions for the growth of UHF television. The substance of this doctrine is manifested in the Commission's consistent refusal to grant applications of VHF stations to enlarge [or, as here, change] their coverage areas when the effect would be detrimental to present or prospective UHF development. . . .

Thus, in an effort to preserve a realistic potential for UHF growth, the Commission has made a judgment that where proposed VHF expansion is likely seriously to jeopardize the development of UHF broadcasting, the 'paramount policy of fostering UHF service would more than offset the policy of encouraging VHF stations to provide the best possible service to the largest number of persons.' . . . Adoption of such an approach is clearly within the Commission's discretion, for it is well settled that '[i]t is for the Commission, not the courts, to pass on the wisdom of the channel allocation scheme,' . . . and so long as the Commission's action in this area is reasonable, it must be upheld. . . .[26]

Thus, in the instant case, the Commission must look to the protection of the new channel 41 (UHF), especially where as here West Michigan's proposal would involve the introduction of a competing VHF signal into most of channel 41's contour, thereby jeopardizing the latter's prospects for viable operation.[27]

In light of these factors, it is apparent that the Commission did not abuse its discretion here. Given the history of television channel allocations in the Grand Rapids area and the fact that what changes in circumstances have occurred since 1961 militate against West Michigan—the all channel receiver legislation; the subsequent FCC policy favoring UHF over VHF development; the allocation of channel 41 to Battle Creek; the grant of operating authority to the latter, as WUHQ–TV; and the

23. Channel 41 must already compete for advertising revenues with an existing (VHF) station—WKZO-TV—in the Battle Creek-Kalamazoo market.

24. See note 7, *supra.*

25. WLCY-TV, Inc., 16 FCC2d 506 (1969), review denied 25 FCC2d 832 (1970), reconsideration denied 28 FCC2d 353 (1971).

26. WLVA, Inc. (WLVA-TV) v. FCC, 148 U.S.App.D.C. —, at —, 459 F.2d 1286. at — (1971) (footnotes omitted).

27. See note 18, *supra*, at 320 and note 20, *supra*, at 1006.

latter's affiliation, along with WZZM–TV, with ABC—we sustain the Commission in its decision here. Even if the allegations of West Michigan were true, a change in location would still not be justified. Since West Michigan did not set forth reasons sufficient, if true, to warrant the requested change in location, a hearing was not required.[28]

## II.

■ The Commission sets forth with clarity in its Memoranda Opinions the bases for its rejection of West Michigan's application to move its transmitter location. There is sufficient basis for our review of the FCC's action, for as this court observed in 560 Broadcast Corporation v. FCC:

> This court has recently considered the problem of specificity in agency findings and opinions. In *WAIT Radio* we said that "an agency or commission must articulate with clarity and precision its findings and the reasons for its decisions." But at the same time "the agency is not required to author an essay for the disposition of each application. It suffices, in the usual case, that [the court] can discern the 'why and wherefore.' " [29]

In light of the Commission's two opinions in this case, we are able to follow the reasoning of the agency. Furthermore, the Commission's references in these opinions to its prior television channel allocations in the Grand Rapids area and to reports and orders with respect to the short spacing rule, provide a comprehensive context for its decision and for judicial appraisal thereof.

## III.

The Commission's opinions and orders denying West Michigan's application to change its transmitter location are accordingly

Affirmed.

---

**28.** See note 11, *supra*, 351 U.S. at 205, 76 S.Ct. 763.

**29.** 135 U.S.App.D.C. 330, 331, 418 F.2d 1166, 1167–1168 (1969) (footnotes omitted).