H & B COMMUNICATIONS CORPO-
RATION, Appellant,

v.

FEDERAL COMMUNICATIONS COM-
MISSION, Appellee,

Prescott TV Booster Club, Inc.,
Intervenor.

No. 22685.

United States Court of Appeals
District of Columbia Circuit.

Argued Sept. 15, 1969.

Decided Nov. 13, 1969.

Mr. George H. Shapiro, Washington, D. C., with whom Mr. Harry M. Plotkin, Washington, D. C., was on the brief, for appellant.

Miss Katrina Renouf, Counsel, Federal Communications Commission, with whom Messrs. Henry Geller, General Counsel, John H. Conlin, Associate General Counsel, and Mrs. Lenore G. Ehrig, Counsel, Federal Communications Commission, were on the brief, for appellee.

Before FAHY, Senior Circuit Judge, and TAMM and ROBINSON, Circuit Judges.

FAHY, Senior Circuit Judge:

H & B Communications Corporation, appellant, is the owner and operator of a CATV system serving Prescott, Arizona. Prescott T.V. Booster Club, Inc., intervenor, applied to the Commission for a construction permit for a new VHF translator station, on output channel 2 in Prescott. H & B petitioned the Commission to deny Booster's application or designate it for a hearing, but the Commission denied the petition and granted the application in an Opinion and Order of December 26, 1968. H & B appeals pursuant to Section 402(b) (6), urging that a hearing should have been conducted to determine the extent to which interference from the proposed translator could be eliminated. We re-

mand the case to the Commission for such a hearing and a re-evaluation of the ultimate issue of the public interest to be considered in light of the hearing.

Translators and CATVs are both designed to supplement regular television broadcasting in small communities where direct reception is either weak or nonexistent. The translator receives television signals from a distant location on its original broadcast channel, converts to another television channel, and then amplifies and transmits to the general public.[1] On the other hand, the CATV system, after receiving distant signals by means of an antenna, transmits programs through a wire or cable connected to the sets of individual subscribing members who pay for the service, and to no others.[2]

H & B's CATV system presently cables the signals of five Phoenix, Arizona television stations to its subscribers. Booster is licensed to operate four translator stations and rebroadcasts four of the five stations carried by the CATV system. Booster now proposes to transmit the signals of the fifth Phoenix station, causing H & B to object on the grounds that the existing translators have caused interference with CATV reception and that the approval of the proposed fifth translator station would aggravate this situation, inconsistently with the public interest.

In granting the application without a hearing, the Commission acknowledged H & B's allegations of interference, but concluded that under the Commission's rules CATV is not entitled to protection. The Commission explained that this CATV system serves only 2,000 homes in comparison with approximately 5,000 homes which receive translator broadcasts and that the applicant is a non-

---

1. Prescott T.V. Booster Club, Inc., is a nonprofit organization, supported by regular membership contributions averaging $12.00 per year. It sponsors the television service without charge.

2. H & B provides CATV reception to subscribing members in Prescott for $60.-

00 per year plus a $10.00 charge for installation. For a review of the status of CATV systems, see United States v. Southwestern Cable Co., 392 U.S. 157, 161–167, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968), which held that the Commission has regulatory authority over them.

profit organization seeking to rebroadcast an educational television station on a noncommercial basis. The Commission's opinion also observed that H & B's CATV system has been operating successfully despite present interference and, if necessary, is capable of taking corrective measures.

H & B concedes that the Commission's rules do not entitle a CATV system to absolute protection against translator interference but contends that a finding by the Commission that the operation of a fifth VHF translator will be in the public interest can only be made after a proper consideration of the impairment of the television services made available to its CATV subscribers. It is claimed that such a determination requires a hearing to resolve the issue of H & B's ability to eliminate the anticipated interference.

We find in the record before the Commission a conflict on the question whether the interference with the CATV system, which would be caused by the additional Booster translator, could be prevented or significantly reduced. If the interference issue is material to the ultimate issue of the public interest, convenience, and necessity, a hearing accordingly would be required. Assuming materiality for the moment, we first describe the claimed interference and the conflict about it.

According to H & B the operation of the existing translators causes two types of interferences to CATV reception. One type results from the use of channels 4 and 6 by both Booster and H & B, causing translator signals to radiate directly into the tuners of the receiving sets of individual CATV subscribers. H & B noted its limited success in eliminating this home interference through the installation of transformers in the sets of individual subscribers. The second type of interference is claimed to be the product of Booster's transmission of signals on channels 4, 6 and 7 adjacent to the Phoenix channels 3, 5, and 8 carried by the CATV. Attempts to eliminate this interference through the use of adjacent channel traps on off-the-air antennas and the processing of signals through a Conrac demodulator have also been ineffective according to H & B. Even with such devices, H & B claims that the traps create a degradation of CATV signals and the interference continues to exist at least two days a month. The effect of authorizing Booster to translate signals on channel 2, argues H & B, will be to create interference to the CATV subscriber's reception on cable channel 2, previously the only channel free from any interference, and an aggravation of the interference to the off-the-air reception of the adjacent channel 3, which is already subject to interference from the translator's output channel 4.

In response to H & B's petition before the Commission Booster suggested that the home reception interference could be solved by using grounded, shielded wires connected to each receiving set. It further contended that adjacent channel interference could be solved by more effective adjustment of the trapping devices of the kind which Booster has installed. To meet these contentions H & B filed a reply brief explaining that it has in fact attempted to use the shielded cable to reduce home interference but that such a device has been ineffective and a safety hazard. It also contested Booster's claim that different trap equipment could be more effectively utilized by pointing out that H & B transmits color signals which would be distorted by the trap equipment suggested by Booster. H & B concluded that,

> the measures Booster asserts will resolve the interference questions are insufficient for that purpose, or at a minimum * * * the differences between the factual allegations of H & B and Booster cannot be resolved without a hearing.

At this point in the proceedings, the Commission suggested to both parties the possibility of resolving the interference

problem through the use of another VHF channel by Booster, but both H & B and Booster agreed that this proposal was not satisfactory. In replying to the Commission, Booster made additional suggestions to H & B for eliminating the interference, which H & B in its response to the Commission refuted.

The Commission, with the record as thus set forth, rendered its decision without any reference to the conflict on possible solutions to the interference problem. Instead the Commission concluded that the interference could be eliminated either by relocating the head end of the CATV system or through the use of microwave relay stations. In its Motion to Stay the Commission order, H & B argued that the Commission's decision suggested no remedies to the interference in home reception and that its resolution of the adjacent channel interference issue was unsupported by facts presented to the Commission, was inadequate and too costly.

From the foregoing it seems clear that the record before the Commission did not furnish the basis for a dispositive decision as to the extent to which interference could be mitigated or eliminated. The parties were clearly in disagreement on the issue of interference and H & B's claims were not without credible support as the record stood. Even if the Commission's conclusion on the flexibility of the CATV system and the ability of H & B to eliminate interference by the means it suggested can ultimately be justified, it seems necessary to enlarge the record by a hearing which would furnish a basis for such a resolution of the issue.

We come then to the question whether the issue is material. If not, then under Section 309(d) (2) [3] a hearing is not required. It is of some significance on the question of materiality that the Commission considered at some length the possibility of eliminating interference as though it were material. Indeed, the Commission in its decision seems to have relied substantially upon its conclusion that it could be eliminated. Resorting to its own language, we find the Commission stating, "There are techniques available to the CATV system to enable it to cope with this type of problem," and, again, "the system has remedies available to it and a certain flexibility which enable it to protect itself against interference at its head end. It may, for example, relocate its head end or it may use microwave relay stations to bring the signals of the Phoenix stations to Prescott." We recognize that the Commission made no suggestions as to how H & B could eliminate direct interference to home reception of CATV subscribers, as it specifically addressed itself to the adjacent channel interference problem. However, its repeated reference to the "flexibility" of the CATV system suggests that it concluded that the home reception problem could also be solved.

The Commission now argues on appeal that these references to the flexibility of the CATV system and its ability to eliminate interference were merely hortatory as the CATV is not entitled to protection from interference. However, we have difficulty in construing the decision itself, in light of the Commission's preoccupation with possible means of eliminating interference, as not having deemed the ability of H & B to eliminate interference as material, if not critical. In reaching our conclusion, we must accept the basis upon which we understand

---

3. Section 309(d) (2) provides that,
   If the Commission finds on the basis of the application, the pleadings filed, or other matters which it may officially take notice that there are no substantial and material questions of fact and that a grant of the application would be consistent with [the public interest, convenience, and necessity], it shall make the grant, deny the petition, and issue a concise statement of the reasons for denying the petition * * *. If a substantial issue and material question of fact is presented * * * it shall [formally designate the application for a hearing].

the Commission itself decided the case, rather than as it is now somewhat differently presented to the court. Securities & Exchange Comm'n v. Chenery Corp., 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 (1943); National Labor Relations Board v. Metropolitan Life Ins. Co., 380 U.S. 438, 443–444, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965); WAIT Radio v. FCC, 135 U.S.App.D.C. 317, 418 F.2d 1153, decided June 24, 1969.

■ Independently of our conclusion that the Commission, without an adequate record, resolved the issue of interference as one which was material to its decision, we conclude that it is a material issue within the meaning of Section 309(d) (2) of the Act, even though a CATV system is not protected from interference.[4] The Commission was required to rest its decision, as it undertook to do, on a finding that the translator service promotes the "public interest, convenience, and necessity." In so doing it is incumbent upon the Commission not only to give weight to the benefit which 5,000 households would gain through the operation of an additional, noncommercial, translator service, but to consider, in comparison, the harm which might result from the interference to some 2,000 CATV subscribers. Though CATV subscribers pay for their services on a commercial basis they nevertheless are members of the community who are entitled to have their interests considered. Assuming that a CATV system is an unprotected television service, such a weighing process nevertheless is required. In Interstate Broadcasting Co. v. FCC, 116 U.S.App. D.C. 327, 323 F.2d 797 (1963), the issue

was whether the granting of a radio broadcast license was in the public interest when it caused interference with petitioner's broadcast beyond a specifically protected broadcast area. The court held:

> The Commission seems to take the position that it may deprive listeners of a recognized but unprotected service without determining that such deprivation is consistent with the public interest. The concept of a protected contour implies a legislative judgment by the Commission that new services which destroy an existing service beyond that contour are normally more in the public interest than the service they destroy. In effect the Commission's rules embody this judgment. It is a reasonable one and within the Commission's discretion.[5]

Interstate Broadcasting Co., *supra*, at 801. The court went on to state, however, that the petitioner must be given a full opportunity to demonstrate that special circumstances might justify a change or waiver in the rules. In this regard the court stated that,

> The Commission is required to consider "not only the public benefit from the operation of the new station, but also any public loss which it might occasion. Only by such a balancing can the Commission reach a legally valid conclusion on the ultimate question of the public interest." Democratic Printing Co. v. Federal Communications Commission, 91 U.S.App. D.C. 72, 75, 202 F.2d 298, 301.[6]

Interstate Broadcasting Co., *supra*, at 802.

---

4. The Commission relies on its Rule 74.-703, which prohibits VHF translators from interference with a "television broadcast station." But the lack of any reference to the CATV system in this particular Rule does not of itself preclude their protection, much less consideration of interference when the public interest so requires.

5. The Commission's rules embody no judgment applicable to the question of translator interference with a CATV sys-

tem. In this respect the case differs from one where a party requesting a hearing to determine that a Commission rule is inappropriate must allege reasons, sufficient if true, to justify a change or waiver. *See* United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956).

6. *Cf.* Hall v. FCC, 99 U.S.App.D.C. 86, 237 F.2d 567 (1956); Television Corporation of Michigan v. FCC, 111 U.S. App.D.C. 101, 294 F.2d 730 (1961).

The present record suggests that the approval of the proposed translator service might adversely affect some members of the public even though it will benefit others. Both considerations are material and the weighing process required by such a situation cannot be accomplished properly without a record more fully developed by means of a hearing which will determine the extent to which the interference can be eliminated.[7]

Reversed and remanded.

TAMM, Circuit Judge, (concurring):

I agree with the result reached and the reasoning advanced in the majority opinion; in order to avoid any possible misunderstanding regarding the scope of today's decision, however, I think it desirable to state explicitly several factors which I believe are implicit in the majority's analysis.

I am in accord with the majority's conclusion that the Commission was required to balance public gains and losses in television service resulting from approval of the new translator station under the governing standard of "public interest, convenience, and necessity," in spite of the fact that CATV services are not protected under the Commission's broadcast rules. Similarly, I think that this standard would require the Commission to embark upon the same kind of inquiry if it appeared likely that the new translator station would interfere with telephone service in the community. At the same time, I do not think that the Commission would be required to undertake this difficult task of balancing if it were claimed that the translator station would interfere with a citizen's phonograph, or the neon sign in a local hamburger stand; collateral inquiries of this sort could lead the Commission far from the area of its administrative expertise, and inflate the simplest licensing proceeding to unmanageable proportions. In short, I do not interpret the majority opinion to extend any further than the general principle that whenever the Commission undertakes to license one type of communications service, and it appears likely that this new service will degrade or impair the quality of an existing communications service regulated by the Commission, it is required under the public interest standard to balance the gains and losses to the public that will result from the changed conditions in both services.

Thus, I agree that the interference question was "material" for purposes of determining whether a hearing was required under section 309(d)(2); however, I have more difficulty assuming, as the majority apparently does,[1] that appellant's allegations before the Commission satisfied the other test established in section 309(d)(2): that is, that the allegations presented "substantial * * * questions of fact." It is conceivable that the underlying facts of the controversy indicate that the interference issue is not substantial, as the Commission urged at oral argument, and that even if the appellant can prove all of its allegations the public benefit resulting from the new translator station

---

7. We note that H & B throughout the proceedings, suggested the alternative use of UHF rather than a VHF translator, and that the Commission in its order denying a motion to stay for the first time determined that a UHF translator would not be economically feasible. While it is not necessary for us to decide whether H & B sufficiently raised the issue prior to the Commission's original decision, we nevertheless conclude that on the remand the possible availability of a UHF frequency for use by Booster should be included in the weighing process we have required and if there are factual issues in dispute, as there appear to be, they should also be designated in the hearing on the remand.

1. I do not understand the majority to imply that "substantial" is used as a synonym for "material" in section 309(d)(2), so that the Commission must hold hearings on every material question of fact, however trivial, that an opposing party asserts. Such a construction obviously would defeat the purpose of section 309(d)(2), and could involve the Commission in a great deal of needless work.

so far outweighs any public detriment from interference with the CATV system that a hearing would be a useless exercise. However, we must look to the Commission's decision rather than to the arguments which it urges in this court with the benefit of hindsight, and I do not believe that the Commission's opinion, fairly read, reflects a finding that the issues presented by the appellant were not substantial. As we said in West Michigan Telecasters, Inc. v. FCC, 130 U.S.App.D.C. 39, 42, 396 F.2d 688, 691 (1968), "in order for a court to exercise in any meaningful way its function of review, it is necessary that the Commission state specifically the basis for each of its conclusions."