Ethel C. HALE and W. Paul Wharton, Appellants,

v.

FEDERAL COMMUNICATIONS COMMISSION, Appellee,

KSL, Incorporated, Intervenor.

No. 22751.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 16, 1969.

Decided Feb. 16, 1970.

---

2. Or the blackboard sketch.

Mr. Robert N. Levin, Washington, D. C., for appellants. Mr. Robert L. Freedman, Washington, D. C., also entered an appearance for appellants.

Mr. D. Biard MacGuineas, Counsel, Federal Communications Commission, with whom Messrs. Henry Geller, Gen. Counsel, John H. Conlin, Associate Gen. Counsel, and Mrs. Lenore G. Ehrig, Counsel, Federal Communications Commission, were on the brief, for appellee.

Mr. Glen A. Wilkinson, Washington, D. C., with whom Mr. Robert W. Barker, Washington, D. C., was on the brief, for intervenor. Mr. Leon T. Knauer, Washington, D. C., also entered an appearance for intervenor.

Before McGOWAN, TAMM and ROBB, Circuit Judges.

PER CURIAM:

This statutory review proceeding under the Federal Communications Act, 47 U.S.C. § 151 et seq., relates to the Commission's renewal, without an evidentiary hearing, of the radio broadcasting license of KSL-AM, a clear channel station broadcasting throughout the Salt Lake City area.[1] Section 309(a) of the

1. Intervenor KSL, Incorporated, owns, in addition to KSL-AM, television and FM licenses in Salt Lake City which were renewed at the same time. The initial protest by appellants was directed in terms only against the AM renewal, although in this court appellants, now represented by counsel for the first time,

Act authorizes renewal only upon the Commission's finding that the "public interest, convenience, and necessity" would be served thereby. Appellants, individual residents of the Salt Lake area, had filed with the Commission letters protesting renewal, and requesting that the matter be set down for hearing pursuant to Section 309(e) of the Act, which reads in part:

> If, in the case of any application to which subsection (a) of this section applies, a substantial and material question of fact is presented or the Commission for any reason is unable to make the finding [that the public interest would be served], it shall formally designate the application for hearing * * *.

The Commission, however, determined that there were no substantial questions of fact requiring resolution by means of a hearing, and that it was able to make a public interest finding without the aid of a hearing.

The two matters which require the illumination of a hearing, so appellants assert, are (1) the quality and fairness of the licensee's programming and (2) the impact upon the public interest of the concentration of ownership in the intervenor of communications and other business interests.[2] As to the first, we have examined carefully the assertions made in appellants' letters to the Commission, and we find them far short of the kind of factual allegations which were brought forward by the protestants in *United Church of Christ*, note 2 *supra*. Mainly appellants have attempted to establish that KSL-AM has been broadcasting in violation of the FCC's "fairness doctrine." That doctrine, relating to the broadcasting of controversial issues of public importance, requires that a station's programming present the several viewpoints that have developed around such issues. Its concern is with the scope of coverage of the station's total programming.[3]

▆▆▆ To establish a violation of this doctrine, appellants must show that specific programs have dealt with controversial issues partially, and, if so, that other programs on the station have not balanced the coverage by presenting the alternative viewpoints.[4] While the doctrine does look to the general balance of a station's programming, proof of a violation must be based on quite specific facts:

> Where complaint is made to the Commission, the Commission expects a complainant to submit specific information indicating (1) the particular station involved; (2) the particular issue of a controversial nature discussed over the air; (3) the date and

---

appear to assume that the validity of the other two license renewals is before us. We do not think it important to resolve this ambiguity, since the disposition we make of the AM protest would apply to the TV and FM licenses as well.

2. The intervenor, but not the Commission, urges upon this appeal that appellants are without standing to complain, either before the Commission or in this court, of the license renewal. We think the Commission's position here reflects the more prescient reading of our opinion in Office of Communication of United Church of Christ v. FCC, 123 U.S.App.D.C. 328, 359 F.2d 994 (1966).

3. The fairness doctrine deals with the broader question of affording reasonable opportunity for the presentation of contrasting viewpoints on controversial issues of public importance. * * * [T]he licensee, in applying the fairness doctrine, is called upon to make reasonable judgments on the facts of each situation—as to whether a controversial issue of public importance is involved, as to what viewpoints have been or should be presented, as to the format and spokesmen to present the viewpoints, and all the other facets of such programming.

FCC., Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance, 29 Fed.Reg. 10415, 10416, (1964).

4. Appellants claim their inability to survey KSL-AM's general programming is due to the fact that the station does not publish a daily log of its programming in any newspaper. Such logs, however, are required to be kept by the licensee and could have been made available upon request. *See* 47 C.F.R. §§ 73.111–.116.

time when the program was carried; (4) the basis for the claim that the station has presented only one side of the question; and (5) whether the station had afforded, or has plans to afford, an opportunity for the presentation of contrasting viewpoints.[5]

When viewed against this not unreasonable standard, it cannot be said that appellants' allegations present material questions of fact with respect to fairness doctrine violations, or the calibre of programming generally, that would require a hearing.[6]

The second issue raised by appellants is of more substance. It rests upon the claim that KSL-AM is part of a business conglomerate so constituted as to create an undue concentration of business and broadcasting influence in the Salt Lake City area communications market. We perceive no disputed factual issues regarding the existence of the conglomerate structure. Those facts, set out in the margin,[7] are agreed upon by the parties. The policy questions they raise are applicable to the communications industry as a whole, and are not peculiar to one unit of it.

Appellants do assert that this particular concentration has had ill effects on the communications media in Salt Lake City, and is thus not in the public interest. But here again, to merit a hearing under Section 309(e), appellants must go beyond generalization and allege some specific instances of injury in the immediate context of the intervenor's operations, not merely that it is unwise for newspapers to be under common ownership with radio and television interests, and for both to be part of a broader business combine. In two recent opinions, involving the license renewals of WCCO-AM [8] and KRON-FM,[9] the Commission designated the renewal applications for hearing after the parties protesting the renewals had alleged, in the case of WCCO, that the conglomerate was using the economic power of its newspaper to obtain unique sports events broadcasting rights for its television station and, in effect, to subsidize advertising for its television station; and in the case of KRON, that the conglomerate was using the economic power of its television station to subsidize the subscription campaigns of its newspaper. Appellants here have not made such specific allegations.[10]

---

5. FCC., *supra* note 3, at 10416.

6. It is not without significance that of the three Commissioners who would have set the matter for hearing, only one purported to think that the individual programming performance of the licensee needed to be pursued. His primary concern, as it was the exclusive one of the other two, was with the broader policy considerations inherent in the undisputed concentration of ownership and the mingling of newspaper and radio-television interests.

7. Appellants, in their brief, offer the following uncontested description of the conglomerate's holdings within the Salt Lake City market:
 * * * KSL, Inc. is owner of TV-AM-FM broadcast licenses in Salt Lake City. KSL is affiliated with the Columbia Broadcasting System. The TV license is of the vhf type, one of three vhf stations in Salt Lake City. The AM station is one of the few so-called

clear channel stations in the country. From its base in Salt Lake City, KSL-AM has a service area that blankets 11 western states. KSL, Inc. is a corporate subsidiary of Bonneville International Corporation which, in turn, is wholly owned by the Mormon Church. In addition to KSL-TV-AM-FM in Salt Lake City, the Church also owns Brigham University and, through the University, an educational TV-FM complex at Provo, Utah.
 Beyond its broadcasting interests, the Church is also ultimate owner of a number of mass publications, including one of the two metropolitan dailies in Salt Lake City, the Deseret *News*.

8. 16 F.C.C.2d 943 (1969); 17 F.C.C.2d 290 (1969).

9. 16 F.C.C.2d 882 (1969); 17 F.C.C.2d 245 (1969).

10. *Compare* Joseph et al. v. FCC, 131 U.S. App.D.C. 207, 404 F.2d 207 (1968),

Appellants essentially argue that the fact of the concentration, without further showing, is enough to require a hearing to determine whether the license renewal would serve the public interest. This is in reality a challenge to the wisdom of the Commission's existing multiple ownership rules,[11] which have allowed the granting of licenses to conglomerate structures of the kind involved here. Thus it is that, in the context of this particular renewal proceeding, appellants seek a hearing to effectuate an overhaul of the Commission's general policy that multiple ownership and resulting concentration are not *per se* against the public interest. The Commission has, however, embarked upon rule-making in this very area of multiple ownership of AM, FM, and TV operations, 33 Fed.Reg. 5315; and it has initiated investigations into conglomerate ownership. Dismissing informal renewal protests very similar to those made by appellants, the Commission had this to say:

> We believe that, in view of this showing, there is no basis for *ad hoc* action against the licensee on grounds of undue concentration of control of media of mass communications. Rather, any actions in this area as to a licensee such as this would be appropriate only in the context of overall rule-making proceedings. In this connection we point out the outstanding inquiry on conglomerate ownership and the specific rule-making proceeding, FCC Docket No. 18110.[12]

■ There is a rational foundation for the Commission's position that a basic change in policy such as appellants here seek is better and more fairly examined and considered in rule-making

proceedings, where the inquiry can be thorough and where all interested parties can participate. Appellants' protests seem to us to assert that undue concentration of communications media has a tendency towards adverse impact on the public interest which warrants a policy of flat prohibition without reference to whether there are incidental injuries in fact. But this is the very question which the Commission is presently pursuing in actual rule-making and in investigations looking toward rule-making. That pursuit may be more effectively and properly carried on there than by setting this renewal application down for hearing with a view to a change in policy with respect to this particular applicant.

Affirmed.

TAMM, Circuit Judge (concurring).

Today I cast my vote with the majority solely because the Federal Communications Commission is currently undertaking a comprehensive review of its doctrines governing concentration of control in the mass media; *cf.* Pikes Peak Broadcasting Co. v. FCC, 137 U.S. App.D.C. 234, 243–244, 422 F.2d 671, 680–681, cert. denied, 395 U.S. 979, 89 S. Ct. 2134, 23 L.Ed.2d 767 (1969). Absent this single, crucial fact, I would find serious obstacles to affirming the Commission's action in this case.

The general question of what impact the antitrust laws should have upon an administrative agency's licensing and regulatory functions has been a recurrent problem in this court, and undoubtedly many subsidiary issues remain to be resolved. However, the general trend of the decisions has emerged quite clear-

---

where the appellants had presented "detailed reasons why the assignment [of a license] was not in the public interest." Moreover, there the Commission had failed to find that the public interest would be served. The panel remanded for the making of such a finding or the setting of the matter for hearing.

11. 47 C.F.R. §§ 73.35, 73.240, 73.636.

12. Commission letter of November 25, 1969, to protestants of renewal of the Post-Newsweek Stations WTOP-AM-FM-TV in the Washington, D. C. area. (FCC 69–1312 38959). It is of interest to note that no dissents were recorded to this disposition, perhaps reflective of the fact that now the Commission is seriously engaged in a sweeping policy review.

ly. The most recent restatement of these established principles may be found in *Cities of Statesville v. AEC*, No. 21,706 (D.C.Cir. Dec. 5, 1969) (*en banc*) (slip op. at 45–46; Judge Leventhal, concurring):

> The decisions of the Supreme Court and this court over a period of at least 25 years have evolved and defined a substantial jurisprudence making clear that the administration of federal regulatory statutes calling for determinations of the public interest establish the authority, and in some instances the duty, of the cognizant agency to take into account what has been aptly called the nation's "fundamental national economic policy," namely the principles of the antitrust laws. * * *
>
> It is a fair synthesis of the cases that a statute providing for licensing or other regulation is presumed to permit consideration of antitrust principles, with the harmonizing approach [applied to conflicts between antitrust policies and the agency's other regulatory objectives] * * * unless a contrary intent appears expressly or by necessary implication.

*See also* id. at 23–25. It has long been apparent that the foregoing line of authority is germane to the activities of the Federal Communications Commission; *see, e. g.*, National Broadcasting Co. v. United States, 319 U.S. 190, 222–223, 63 S.Ct. 997, 87 L.Ed. 1344 (1943). Indeed, the Supreme Court stated in dictum in United States v. Radio Corporation of America, 358 U.S. 334, 351–352, 79 S.Ct. 457, (1959), that "in a given case the Commission might find that antitrust considerations alone would keep the statutory standard [of "public interest, convenience, and necessity"] from being met, as when the publisher of the sole newspaper in an area applies for a license for the only available radio and television facilities, which, if granted, would give him a monopoly of that area's major media of mass communication."

It is also becoming increasingly obvious that application of antitrust doctrines in regulating the mass media is not solely a question of sound economic policy; it is also an important means of achieving the goals posited by the first amendment. This nexus between the fundamental guaranty of free speech and the mandates of the antitrust law was eloquently noted by Judge Learned Hand in rejecting a claim that the first amendment provided a shield for the anticompetitive practices of a national news service:

> [N]either exclusively, nor even primarily, are the interests of the newspaper industry conclusive; for that industry serves one of the most vital of all general interests: the dissemination of news from as many different sources, and with as many different facets and colors as is possible. That interest is closely akin to, if indeed it is not the same as, the interest protected by the First Amendment; it presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all.[1]

In affirming this decision, the Supreme Court remarked that "[t]he First Amendment, far from providing an argument against application of the Sherman Act, * * * provides powerful reasons to the contrary." Associated Press v. United States, 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1945). Similar considerations moved the Court to state recently, in Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 390, 89 S.Ct. 1794, 1807, 23 L.Ed.2d 371 (1969):

> It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to

---

1. United States v. Associated Press, 52 F.Supp. 362, 372 (S.D.N.Y.1943), aff'd, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945).

countenance monopolization of that market, whether it be by the Government itself or a private licensee. * * It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here.

*See also* National Ass'n of Theatre Owners v. FCC, 136 U.S.App.D.C. 352, 420 F.2d 194 (1969); Barron, Access to the Press—A New First Amendment Right, 80 Harv.L.Rev. 1641 (1967).

This growing realization that a viable marketplace of ideas depends in large measure upon a vigorously competitive economic market comes in the face of disheartening statistics describing the marked trend toward concentration of media ownership.[2] The commonsense suspicion that this creeping growth of media cartels and conglomerates is likely to produce even more bland and homogenous intellectual fare than that which is currently available on the mass media was recently confirmed by a study which found that "[t]o limit audience alienation, large circulation media prefer to report ideas or factual stories that are either inoffensive or on which there is relatively broad agreement or wide acceptance."[3] The risk inherent in allowing these accretions of power to persist unchecked is clear: if control over the gateways to public consciousness devolves upon only a few private entrepreneurs, speech must be more violent and bizarre in order to gain public exposure, and "the sense of the justice of existing institutions, which freedom of expression is designed to assure, vanishes from some section of our population as surely as if access to the media were restricted by the government." Barron, *supra,* at 1649. It was for these reasons that the National Commission on the Causes and Prevention of Violence recommended "that private and governmental institutions encourage the development of competing news media and discourage increased concentration of control over existing media."[4]

Against this background, the Commission's action in this case takes on a particularly disturbing aspect. In many particulars, the procedures leading up to the instant petition seem patently inferior to the standards of administrative rectitude that we have demanded in the application of antitrust principles to other regulatory fields which are, if anything, substantively less important than the subject matter of the present controversy because of the absence of first amendment overtones. Thus, in Marine

2. *See, e. g.,* Violence and the Media [A Staff Report to the National Commission on the Causes and Prevention of Violence] 83–84 (1969):

The prominence of chain ownership in both radio and television has increased steadily. In 1939, 39 chains owned 109 AM radio stations or 14.3 percent of all AM radio. In 1967, 373 chains owned 1,297 AM stations or 31.4 percent of the total. The pattern is similar in television. In 1956, 81 chains owned 203 TV stations or 45.8 percent. In 1967, chain ownership had grown until 147 chains owned 459 stations or 73.6 percent. Although the number of commercial television outlets between 1956 and 1967 increased from 443 to 623, the number of station owners remained constant, 321.

* * * * * *

The trend toward one-newspaper cities has made the problem of cross-ownership of media within the same market more acute. In the fall of 1968, there were 55 cities in which there was ownership or control of a television station by a monopoly newspaper, plus six more cities in which the newspapers were operating under a joint publishing agreement and one or both of the papers owned a television station. In 23 of the 55 cities, the monopoly newspaper controlled the *only* television in the city. In 78 cities, the only daily newspaper owned or controlled the only AM radio station.

3. *Id.* at 81–82.

4. To Establish Justice, To Insure Domestic Tranquility [Final Report of the National Commission on the Causes and Prevention of Violence] at 81 (1969).

Space Enclosures, Inc. v. FMC, 137 U.S. App.D.C. 9, 420 F.2d 577 (1969), we reversed the Federal Maritime Commission's decision to approve without hearing an agreement containing marked anticompetitive features. In so doing, we rejected the agency's contention that the petitioners had not made sufficiently detailed allegations of factual questions to warrant a hearing by stating that "the initial papers exposed issues of substance, issues of such obvious gravity that the Commission should not in any event need prompting from private parties before it holds a hearing" (420 F.2d at 587 n. 27). "[W]hen the issue fairly clamors for attention," we concluded, "even a gentle reminder speaks loud enough for the agency conscientiously discharging its duty" (*id.* at 586).

Here, the appellants—who, according to the record, were private citizens of modest financial means but formidable zeal for advancing their concept of the public interest—did everything but grovel verbally in their repeated attempts to invoke the Commission's power to investigate the effects of the admitted con-

centration. Nonetheless, the majority accepts the Commission's assertion that the petitioners were required to allege not only the evidentiary facts of the concentration itself, but also "some specific instances of injury in the immediate context of the intervenor's operations." At the outset, I am not at all convinced that the Commission's blanket dismissal of the appellants' allegations as generalities is accurate in every respect;[5] at least, the three Commissioners who dissented from denial of the petition for reconsideration thought that the various papers filed by the appellants warranted an evidentiary hearing (J.A. 17–27). However, even if the allegations regarding *effects* of the admitted concentration were technically insufficient, I do not believe that this fact should be deemed an invariable bar to parties seeking an evidentiary hearing on a license renewal application.

Section 309 of the Communications Act sets an admittedly high standard of pleading which must be met before the hearing requirement is triggered, so that frivolous opposition to license applications can be expeditiously dismissed.[6]

---

5. *See, e. g.*, J.A. 156 (letter from appellants to the Federal Communications Commission, dated Oct. 31, 1968) :

KSL gives lengthy attention to an enormous variety of farm activities, going, we believe, far beyond requirements and reasonable attention. In brief, KSL is farm-oriented to the exclusion of other equally-deserving publics. We believe this is not unrelated to the following two examples: David O. McKay, Chairman of the Board of KSL, is associated with The David O. McKay Corporation (farming business). Ezra Taft Benson, member of the Board of KSL, is on the board of directors of Olson Bros., possibly one of the largest poultry concerns in the nation. Olson Bros. is recorded as owning (with Dow Chemical) the Dolco Corporation, which manufactures food packaging. (There is conflicting information on the ultimate ownership of Dolco.) Elder Benson also is a director of Corn Products Company, which manufacturers Best Foods Mayonnaise. We find him listed as associated with the American Dairy Council and the Dairy Council of California.
We submit these two easily accessible examples; we are confident others can

be documented. But most of all, we wish to point to KSL's sibling concerns : The innumerable farming, livestock, dairying, canning, and horticulture interests owned by The Church of Jesus Christ of Latter-Day Saints or its subsidiaries or holding companies in Utah, Nevada, Idaho, Washington, Oregon, California, Florida, and Maryland * * * as well as in Canada, other foreign lands, and probably in American Samoa. Much of this information is perfectly public, but too lengthy to record at this time. Church products range from peanuts to pineapple.
The attention given to agribusiness places KSL in a cooperative position with the great farm lobbies, to the benefit of the above-named holdings, and we suspect, to the detriment of farm laborers who are disadvantaged by political activities of the wealthy farm lobbies.

6. 47 U.S.C. § 309(d) (1) (1964) provides in part:
Any party in interest may file with the Commission a petition to deny any application * * * prior to the day of Commission grant thereof without

However, I see nothing in either the language of the statute or those portions of the legislative history cited to us by the Commission [7] which inexorably dictates the conclusion that a party asserting the existence of an anticompetitive market structure violative of the public interest standard must allege not only the details of the concentration itself, but also evidence of specifically identifiable injuries to the general public proximately caused by the concentration. Realism compels the recognition that the ancient distinctions among "evidentiary facts," "ultimate facts," and "conclusions of law" have always meant different things to different people in different contexts. A better approach is to acknowledge that these terms only begin the inquiry rather than conclude it, and that a more salient doctrine is the principle that "procedural requirements depend in part on the importance of the issues before the agency." Marine Space Enclosures, Inc. v. FMC, 137 U.S.App.D.C. 9, 18 n. 22, 420 F.2d 577, 586 n. 22 (1969).

As noted above, concentration in control of the mass media is certainly an issue of paramount importance, touching on fundamental national policies; as such, it is an area in which insistence on procedural niceties at the expense of those who are attempting to raise serious questions is particularly inappropriate. It is instructive to observe, by way of contrast, that parties alleging anticompetitive conditions in proceedings before other agencies are frequently afforded the benefit of generous presumptions and shifts in burden of proof once they have demonstrated the existence of nonfrivolous antitrust questions. For example, the Supreme Court, in describing the Federal Maritime Commission's treatment of restraints on trade under section 15 of the Shipping Act, noted that "once an antitrust violation is established, this alone will normally constitute substantial evidence that the agreement is 'contrary to the public interest' * *. It is not unreasonable to require that a conference adopting a particular rule [for which it seeks approval] * * * must come forward and explain to the Commission what [its] reasons are." FMC v. Aktiebolaget Svenska Amerika Linien, 390 U.S. 238, 245–246, 88 S.Ct.

---

hearing or the day of formal designation thereof for hearing * * *. The petition shall contain specific allegations of fact sufficient to show that the petitioner is a party in interest and that a grant of the application would be prima facie inconsistent with subsection (a) of this section [which contains the public interest standard]. Such allegations of fact shall, except for those of which official notice may be taken, be supported by affidavit of a person or persons with personal knowledge thereof.

The following subsection provides that the Commission may proceed without an evidentiary hearing if it finds, on the basis of all matters contained in the record and officially noticed, that there are no "substantial and material questions of fact" and that grant of the application would be in the public interest. See generally H & B Communications Corp. v. FCC, 137 U.S.App.D.C. 70, 420 F.2d 638 (1969).

The Commission seems to have taken the position that allegations meeting the specificity requirements of section 309(d)(1) must also meet the test of presenting "substantial and material questions of fact" under section 309(d)(2) in order to merit a hearing. I cannot agree. In order to dispense with a hearing under section 309(d)(2), the Commission must find *both* that there are no substantial and material questions of fact *and* that "grant of the application would be consistent with" the governing standard of public convenience, interest and necessity. It seems entirely possible that uncontroverted factual allegations meeting the pleading requirements of section 309(d)(1) would also constitute a sufficient showing of adverse impact on the public interest to preclude the Commission from granting approval without a hearing under section 309(d)(2).

7. *E.g.*, S.Rep. No. 690, 86th Cong., 1st Sess. 3 (1959).

1005, 1010, 19 L.Ed.2d 1071 (1968). Similarly, the Civil Aeronautics Board, in approving international fare agreements under section 412 of the Aviation Act, has established the principle that once an agreement appears repugnant to antitrust principles on its face, it will not be approved "unless [its] proponents have made a clear showing of the need for approval to fill [a] serious transportation need or secure important public benefits." IATA Credit Agreements, 30 C.A.B. 1553, 1555 (1960); *see also* Local Cartage Agreement Case, 15 C.A.B. 850, 853 (1952). No reason has been suggested to justify the conclusion that more onerous requirements are necessary or appropriate in licensing proceedings before the Federal Communications Commission.[8]

At the same time, there are valid practical reasons for being somewhat less stringent than usual in assessing the sufficiency of petitions similar to those presently in issue. Information regarding the precise effects which concentration of control has on programming and service is much more readily available to the licensee than to the opponent, even if the opponent is a large competing corporation with vast resources. In many instances, it seems likely that the relevant facts can be elicited only through use of subpoenas or other forms of gov-ernmental coercion. Furthermore, antitrust issues, particularly those going to the manner in which concentration affects the quality of service, are not like questions relating to possible violations of the fairness doctrine or accessibility of the broadcaster's facilities to community groups. With respect to the latter kinds of problems, public-spirited groups or individuals can often muster sufficient resources to conduct at least limited monitoring of program content or other information-gathering activities. Compiling the kind of initial factual showing demanded by the Commission as a prerequisite to a hearing on concentration, however, apparently would require not only program monitoring but also laborious perusal of reams of documentary evidence which will likely be dispersed, inaccessible, and unintelligible to one who is not skilled in the intricacies of both antitrust and communications law. These procedural standards can be, in effect, a backhanded method of barring virtually all public interest intervenors from raising questions relating to concentration of control.

The alternative was spelled out by this court in our second opinion in Office of Communication of United Church of Christ v. FCC, 138 U.S.App.D.C. ——, 425 F.2d 543 at 546 (1969):

[A] "Public Intervenor" who is seeking no license or private right is, in

8. It is true, as the Commission points out, that the foregoing examples dealing with *burdens* and *presumptions* are not entirely apposite to the construction of sections 309(d) (1) and (2); rather, they are more directly applicable to the interpretation of section 309(e), which provides that once a license application has been designated for hearing, "[t]he burden of proceeding with the introduction of evidence and the burden of proof shall be upon the applicant, *except that with respect to any issue presented by a petition to deny * * * such burdens shall be as determined by the Commission*" (emphasis added). However, I do not believe that the issues of burden of proof and responsibility for going forward with the evidence should be deemed irrelevant to the initial issue of when a hearing is required. From one perspective, the propriety of denying a hearing *is logically related to the possibility that* the party requesting it will be successful on the merits, since frivolous hearings are not to be condoned. On the other hand, to the protesting party the various procedural burdens constitute a series of hurdles which must be surmounted before it can prevail on its substantive contentions; procedural requirements which are reasonable in themselves can become unreasonably onerous if they are part of an overall regimen which makes meaningful participation in the administrative process impossible. *Cf.* Office of Communication of United Church of Christ v. FCC, 138 U.S.App.D.C. ——, 425 F.2d 543 (1969).

this context, more nearly like a complaining witness who presents evidence to police or a prosecutor whose duty it is to conduct an affirmative and objective investigation of all the facts and to pursue his prosecutorial or regulatory function if there is probable cause to believe a violation has occurred.

This is, admittedly, a less satisfactory procedure than a true adversary encounter in which opponents of comparable skill and resources join issue; its purpose can easily be frustrated if the Commission assumes an attitude of indifference or hostility toward public interest intervenors.[9] However, it is far superior to pretending that members of the general public have a right to be heard when in fact this right is purely mythical for all but the wealthy and powerful. The pending rulemaking proceedings offer some hope that the Commission will finally come to grips with the grave problems inherent in the rising concentration of ownership in the mass media, and that members of the public will be afforded a realistic opportunity to be heard when they feel that they are being cheated out of the vigorous marketplace of ideas promised by the first amendment.

9. The portents are rather ominous. Our remark in the second *Church of Christ* case concerning the Commission staff's "curious neutrality-in-favor-of-the-licensee" (425 F.2d at 547) may have been somewhat of an understatement, in light of the Commission's recent policy statement favoring license renewal applicants over their competitors:

> [I]f the applicant for renewal of license shows in a hearing with a competing applicant that its program service during the preceding license term has been substantially attuned to meeting the needs and interests of its area, and that the operation of the station has not otherwise been characterized by serious deficiencies * * * his application for renewal will be granted.

* * * * *

* * * Where a renewal applicant with other media interests has in the past been awarded a grant as consistent with the Commission's multiple ownership rules and policies, and thereafter proceeded to render good service to his area, it would appear unfair and unsound to follow policies whereby he could be ousted on the basis of a comparative demerit because of his media holdings.

Policy Statement on Comparative Hearings Involving Regular Renewal Applicants, FCC 70-62-40869, at 2, 5 (Jan. 15, 1970).